THE STATE v. FRED LEWIS, alias FRED COL-LINS, Appellant.

Division Two, March 23, 1904.

1. RESISTING ARREST: Warrant For Accomplice.  The defendant and an accomplice had burglarized a bank, and a warrant for the arrest of the accomplice had been issued and placed in the hands of the sheriff, and he, and deceased as a member of the sheriff's posse, went to the house where defendant and deceased were to arrest the accomplice, and when the sheriff rapped on the door the defendant and the accomplice stepped out, with guns in their hands, and commanded the sheriff and his posse to throw up their hands, which deceased did, and at once defendant and the accomplice began firing, and fired six shots, one of them killing deceased while his hands were raised. *Held*, that the offense was committed by defendant and his accomplice while resisting arrest, and clearly showed murder in the first degree.

2. **CONTINUANCE: Consulting With Defendant.** The affidavit of the sheriff stating that he had told the counsel of defendant, who had by order of the court been removed to another county for safekeeping, that he would have the defendant in the jail in the county where the information was filed on a certain day about a week before the trial began, and that defendant's counsel could consult him then as much and often as desired, and that the attorney replied that that was not necessary, that he would have plenty of time while the jury was being summoned, will be taken as true, unless denied by said counsel; and there being no denial, the Supreme Court will not say that the trial court abused its discretion in not granting a continuance on the ground that counsel had not had opportunity to consult with defendant before the trial.

3. **IMPARTIAL JUROR: Finding of Trial Court.** A juror on the *voir dire* examination stated that he had no "leaning in his mind against the defendant;" but answered that he had read some account of the homicide in newspapers, and had stated that "whoever shot deceased was guilty" and that "if defendant was there he was guilty." *Held,* that the examination as a whole shows that he was an impartial juror, and that there being no manifest error in the finding of the trial court, who observed the juror's manner, that he was competent, that finding will not be disturbed.

4. **EVIDENCE OF ANOTHER CRIME: Motive.** Where it becomes necessary to show motive for the crime for which defendant is on trial, testimony concerning another crime recently theretofore committed and connected with the one under investigation, is permissible for that purpose. And in this case, wherein defendant is being tried for killing a member of the sheriff's posse while resisting arrest for the burglary of a bank about four weeks previously, it is held that evidence in regard to the robbery of the bank was admissible.

5. ———: ———: **Concealing Stolen Goods: History of the Crime.** If murder is committed in an attempt to conceal stolen goods, evidence tending to connect the murder with the robbery may be introduced at the murder trial, in order to prove the motive and object of the homicide, and as a part of its history.

6. ———: **Identity.** The sheriff, assisted by deceased and others, attempted to arrest defendant and an accomplice for the robbery of a bank, and the accomplice and defendant, after sending the other persons in the house to places of safety, stepped into the yard where the sheriff's posse were, ordered them to throw up their hands, which they did, and then fired on them six times, killing deceased, and took from another of the posse a revolver, and when they were arrested about a month after·

State v. Collins.

wards in a distant State, this revolver was found on one of them, and also a large sum of money that had been taken from the bank that had been burglarized. *Held*, that evidence concerning the robbery of the bank was proper for the purpose of identifying the defendant.

7. ————. Motive: Generally. Whenever in a criminal trial proof of motive is an essential ingredient of the evidence against defendant, the motive to be established is the one which induced the commission of the crime charged in the indictment.

8. CONSPIRACY: Pleading: Admissions of Accomplice. Declarations and admissions of an accomplice in crime, made while the conspiracy exists, are admissible in evidence against the defendant, and in order to render such evidence admissible it is not necessary that the information charge the existence of the conspiracy.

9. PRINCIPALS: Admissions. Where two defendants are charged as principals, statements made by one of them during the joint commission of the crime is admissible in evidence against the other.

10. REFUSING DEFENDANT'S INSTRUCTIONS. Where the instructions given cover every feature of the case, no error is committed in refusing other instructions asked by defendant.

11. INFORMATION: No Affidavit: Waiver. Where no objection is made to the information before or during the trial, the point made in the appellate court that the information was not supported by affidavit comes too late.

Appeal from Franklin Circuit Court.—*Hon. Wm. A. Davidson*, Judge.

AFFIRMED.

*Jesse M. Owen, W. L. Cole* and *Jesse H. Schaper* for appellant.

(1) The trial court erred in overruling, over defendant's objection, defendant's motion for a continuance. The purpose of the law is to afford the accused an equal chance with the accuser, not only upon the trial of the cause, but also as to the means to prepare for the trial. This right of the accused is substantive; if this right is denied, the right of a fair and impartial

trial is also denied. The fact that the court assigned defendant counsel and thereupon by its action separated defendant from his counsel until the moment the trial is begun, amounts to this—that the court placed defendant upon the trial of his life without the assistance of counsel and opportunity to prepare his defense. It will not do to say that the ground assigned by the motion is not a ground given by the statute for a continuance, for the law presupposes that the trial court, before putting the defendant upon his trial, will not only assign him counsel in name, but also afford him and his counsel a reasonable opportunity to consult and "have process to compel the attendance of witnesses in his behalf." (2) The trial court erred in refusing to sustain appellant's challenge of juror Hensler, for cause. The juror's opinion was that "defendant was guilty, if he was there," and the substance was that the juror believed that defendant was guilty of the murder of Schumacher, if he, the defendant, was present at the time and place of the homicide. (3) The record shows that this juror started in the trial of this case with the presumption that the defendant was guilty of the charge, instead of according to the defendant the presumption of innocence attending and protecting him throughout the trial until overcome by the evidence; the presence of the defendant at the place of the homicide was not an issue in the case, since the fact of his presence was not a controverted fact. Therefore this juror could not give the defendant a fair and impartial trial. Sec. 22, art. 2, Constitution; sec. 2616, R. S. 1899. (4) The trial court erred in admitting illegal and improper testimony offered by the State. (a) The admission of this testimony is contrary to the first fundamental rule of the law of evidence, that the evidence offered must correspond with the allegations, and be confined to the point in issue. Greenleaf on Evidence (14 Ed.), secs. 50, 51. (b) The admission of this testimony was contrary to the exceptions to the above rule

admitting testimony of one criminal act as evidence of
another, in this—that in the case at bar there was no
connection shown to have existed in the mind of the de-
fendant at the time of the commission of the burglary
of the Bank of Union on December 26, 1902, linking
that act with the commission of the homicide of Schu-
macher on January 24, 1903. Schaffner v. Com., 72
Pa. St. 60; 1 Bishop's New Criminal Procedure, sec.
1120; People v. Molineux, 16 N. Y. Crim. 120; People
v. Shea, 147 N. Y. 78; Commonwealth v. Jackson, 132
Mass. 16. (c) The admission of this testimony is
contrary to the law which gives the accused the right
"to demand the nature and cause of the accusation."
Sec. 22, art. 2, Constitution. (d) The admission of
this testimony bade the jury to find that the defend-
ant's character was bad, although that question was not
raised by the defendant himself or any witness who
testified for him. (e) The admission of all this testi-
mony detailing the facts and circumstances attending
the burglary of the Bank of Union was carried out to
the most minute detail—the counting of the stolen cur-
rency, the gold and silver, and exhibition of the same
before the jury—and tended to prove a separate and
independent crime with which the defendant was not
charged. (f) The admission of this testimony was not
stricken out or modified by any instruction of the court
declaring its legal effect or for what purpose the same
might be considered by the jury. (5) The information
in this case does not charge a conspiracy between Ru-
dolph and defendant Collins to kill and murder Schu-
macher; therefore, the admission of declarations made
by Rudolph relating to the homicide of Schumacher,
and subsequent thereto, was no evidence of the guilt of
this defendant, but its effect was to prejudice the minds
of the jurors. State v. Kennedy, 177 Mo. 98; State v.
Walker, 98 Mo. 95; State v. McGee, 81 Iowa 17. (6)
The trial court erred in refusing defendant's request
to instruct the jury on all questions of law applicable to

the case.  (a)  Because there was evidence to warrant an instruction on murder in the second degree.  The failure to so instruct was error.  (b)  Because there was evidence to warrant the giving of an instruction on manslaughter.  The failure to do so was error.  (c) There was no allegation of a conspiracy between the co-defendants contained in the information, although declarations of codefendant Rudolph made subsequent to the homicide were admitted in evidence, and these declarations were not admissible.  Therefore, the failure of the court to direct the jury to disregard the same was error.  State v. Kennedy, supra.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State; *James Booth* of counsel.

(1)  The sheriff's affidavit stated that when the demand was made upon him by defendant's counsel to return the defendant to the jail at Union, he, the sheriff, stated that he "would have defendant in jail at Union, Missouri, by Wednesday last, if the court consented, and that said attorneys could then consult with the defendant as fully as they desired," and defendant's counsel, Schaper, replied that it was not necessary; that they, the attorneys for defendant, would have plenty of time, as a jury would have to be summoned.  This statement of the sheriff is undenied.  In fact, so far as the record is concerned, it stands admitted.  These facts, considered with the general doctrine that the granting of a continuance is a matter resting largely in the discretion of the trial court, and that nothing but the abuse of that discretion warrants interference by appellate courts, show that there was no reversible error in the ruling upon the application for a continuance. State v. Parker, 106 Mo. 217; State v. Turlington, 102 Mo. 642; State v. Bailey, 94 Mo. 311; State v. Williams, 170 Mo. 204; State v. Fox, 79 Mo. 109; State v. Banks, 118 Mo. 117; State v.

Riney, 137 Mo. 102; State v. Dewitt, 152 Mo. 76; State
v. Webster, 152 Mo. 89; State v. Craft, 164 Mo. 631.
(2) It is no ground of challenge that a juror has formed
an opinion from rumor or from newspaper reports.
State v. Williamson, 106 Mo. 162.   One who has formed
an impression or opinon as to the guilt or innocence of
the accused on newspaper reports, which it would re-
quire evidence to remove, is a competent juror if such
opinion would readily yield to the evidence in the case.
State v. Elkins, 101 Mo. 344; State v. Cunningham, 100
Mo. 382; State v. Gartrell, 171 Mo. 489; State v. Hunt,
141 Mo. 630; State v. Bronstine, 147 Mo. 530.   Whether
a juror is competent is for the trial court to determine,
and such determination will not be disturbed on appeal,
except in cases of manifest error.   State v. Brooks, 92
Mo. 542; State v. Williamson, 106 Mo. 162.   (3)   The
testimony with reference to the burglary of the bank
at Union on the 26th of December was competent for
the purpose of showing the motive of the defendant in
committing the homicide.   State v. Clough, 7 Neb. 320;
State v. Witzingerode, 9 Ore. 153; State v. Johnson, 95
Mo. 623;   State v. Dellmer, 124 Mo. 426;   Wharton's
Criminal Evidence (9 Ed.), 48; Underhill on Evidence,
sec. 68; Abbott's Trial of Criminal Cases, sec. 198.   The
evidence in question was admissible at the time and
under the circumstances admitted for the purpose of
showing the identity of the defendant as well as to prove
motive.   (4)   Evidence of the declarations and admis-
sions of an accomplice in crime may be admitted against
the principal, or the declarations admitted as against
the accomplice.   If they were acting in conjunction and
aiding and abetting each other in the perpetration of the
crime, or if they had been guilty of a former offense
and were endeavoring each to jointly conceal the fruits
of the former crime, and to avoid arrest, such circum-
stances would render the declaration of one admissible
against the other, when spoken in reference to the com-

mission of the crime charged. And what is said with reference to the declarations of an accomplice, may also be said with reference to the acts and conduct of the respective parties. The case of State v. Kennedy, 75 S. W. 979, cited by defendant, is in support of our contention in this respect. This evidence was admissible without there being a charge contained in the information that a conspiracy existed between the defendant and Rudolph. State v. Melrose, 98 Mo. 594; State v. Hildebrand, 105 Mo. 318; State v. McGraw, 87 Mo. 161; State v. Daubert, 42 Mo. 239; State v. Ross, 29 Mo. 32. These circumstances alone are sufficient to authorize the introduction of declarations of the conduct of Rudolph against the defendant. State v. Walker, 98 Mo. 95; State v. Dunklin, 64 Mo. 262. (5) Defendant has for the first time raised the question of no affidavit in his brief, having not only failed to move to quash the information, but also failed to set up in either the motion for a new trial or in arrest of judgment, the specific charge that the information was not properly verified by the prosecuting officer or sworn to by some material witness. It, therefore, follows that a complete waiver was indulged at all times while the case was pending before the trial court, the question at no time having been presented to him for his determination. Not having been called to the attention of the trial court, a waiver is presumed, and any objection in that respect presented first in the appellate court comes too late. State v. Gilmore, 95 Mo. 354. Objections to irregularities and omissions of this character should be made before trial and the objections comes too late after verdict. State v. Burgess, 24 Mo. 381; State v. Brooks, 94 Mo. 121; State v. Doyle, 107 Mo. 36; State v. Day, 100 Mo. 242; State v. Elvins, 101 Mo. 243; State v. Harris, 73 Mo. 288; State v. Mertens, 14 Mo. 94.

BURGESS, J.—Defendant was convicted in the circuit court of Franklin county of murder in the first

degree, and his punishment fixed at death, under an information filed by the prosecuting attorney of said county, charging him and one William Rudolph with having shot to death with a pistol one Charles J. Schumacher at said county on the 24th day of January, 1903. The case is before us upon defendant's appeal for review.

On the night of December 26, 1902, the Bank of Union at Union, Missouri, in Franklin county, was burglarized by two men. It afterwards developed that these two men were the defendant, Fred Lewis, alias Fred Collins, and William Rudolph. The burglary was committed by the use of some high explosive, which blew open the vault and totally destroyed the safe containing a large amount of money and other valuable property. This money and property, which consisted of $10,000 in cash and about $80,000 in notes and securities belonging to the bank, was placed in a sack and carried away. The deceased, Charles J. Schumacher, at this time was in the employ of the Pinkerton Detective Agency as a detective, and was sent to Franklin county to investigate the burglary above mentioned, and to determine, if possible, the persons who committed it. In this investigation he traveled over the greater part of Franklin county, including the towns of Union, St. Clair, and Stanton, and particularly the territory surrounding Stanton. He reached Stanton about the 21st or 22d of January, and there learned that one William Rudolph, who had been gone from home for some time, and who lived in that community a short distance from Stanton, had recently returned, bringing with him another man, known as Collins, but whose real name it afterwards developed was Fred Lewis, the defendant herein. These two men were suspected of having committed the burglary. Acting upon this suspicion, and from all the circumstances and information obtainable, the deceased, Schumacher, in company with Robert Schmude, left Stanton on the morning of the 22d of

January—two days before the killing—for the osten-
sible purpose of rabbit hunting, the real purpose, how-
ever, being to make further investigation as to the truth
of the report that the defendant and Rudolph had bur-
glarized the bank at Union.   During the course of the
day they reached the premises of Frank Rudolph, the
stepfather of William Rudolph, where William Rudolph
and the defendant were staying at that time.   They
knocked at the door, and asked for a drink of water.
The door was opened just wide enough to enable some
lady in the house to hand out a cup of water.   After
this either Schmude or the deceased asked if they might
not get dinner there, stating that they had been hunting,
were hungry, and wanted something to eat.   The per-
son who had been at the door stepped away, when Wil-
liam Rudolph came up, and asked them what they
wanted.   They again stated that they wanted something
to eat.   Rudolph said, "Hand me your guns, gentle-
men."   The guns were placed in the corner of the room,
where Rudolph could guard them while they were eat-
ing.   After this they took their guns and departed,
going back to Stanton.

After they had returned to Stanton, Schumacher
applied to a justice of the peace for a search warrant
giving authority to search the Rudolph home for the
purpose of discovering, if possible, the money stolen
from the bank.   At the same time he requested the
sheriff of the county to come to Stanton and assist him
in making the arrest.   The sheriff sent his deputy, L.
Vetter, to assist in this work.   Before leaving Union,
Vetter obtained a warrant for the arrest of Rudolph
upon the charge of burglary.   Vetter then organized a
posse of men at Stanton, composed of Charles J. Schu-
macher, Emanuel Cromer, and B. F. Tichenor, and went
with them to the Rudolph home, four miles northwest
of Stanton.

The Rudolph house was about sixty feet long, forty
feet wide, with four doors on the west side, and stands

north and south on a slight elevation, sloping off towards the west. It is situated in the midst of a clearing of an acre or an acre and a half. Scattering trees were standing at places within thirty feet of the house. The deceased, with the deputy sheriff and the other parties, were on foot, armed with shotguns and revolvers. The latter they carried in their pockets. The ground was covered with about six inches of snow. They approached the Rudolph home from the west side, walking together. The Rudolph family at this time consisted of Frank Rudolph, his wife, two daughters, one fourteen and the other eighteen years of age; William Rudolph and the defendant, Fred Collins, being there at the time.

As soon as it was discovered that the sheriff and deceased and their companions were approaching the house, William Rudolph requested his mother and two sisters to go to the basement. George Harmes was at the Rudolph house at the time, and a few moments before the shooting walked with old man Rudolph from the front door to the blacksmith's shop about 100 yards from the house. Just as Harmes reached the blacksmith's shop, he turned, and looked back, when he saw William Rudolph come out of the house with a Winchester rifle in one hand, and run to the corner of the house, looking towards the four men who were approaching, and then immediately return into the house. The deceased and deputy and the two other parties approached the house in an ordinary manner. Tichenor went to the northwest corner of the house, to see that no one should escape. The other three men, Vetter, Cromer, and Schumacher, went to the second door and knocked. When they rapped at the door, the defendant and William Rudolph came out, with weapons in their hands, and ordered the men to throw up their hands. The deceased, while standing about four feet from the house, immediately threw up his hands, while Rudolph and Collins began firing their weapons

at once.   The deceased made no effort to fire his gun, and with his hands uplifted received six wounds, one striking him in the forehead, passing through the brain, causing instant death.

After the deceased had fallen, Collins and Rudolph took some articles from his person, including his watch and chain, some money, and his firearms.   The body of the deceased remained where it fell from ten o'clock in the morning until five o'clock in the afternoon, when a posse of men in charge of the sheriff went to the premises, and removed it to the undertaker's establishment át Stanton.   The defendant, Collins, and Rudolph went to Armstead, not far distant, where they obtained some horses and rode away.   Shortly after leaving Armstead, they met two men by the name of Nehsiser and Meyerseick, and ordered them to throw up their hands.   Several shots were exchanged, but they made their escape from the county.   About a month later they were arrested in Hartford, Connecticut, and on their persons were found several large revolvers, among them one which they had taken from Cromer on the day of the murder.   Large sums of money were also found in their possession at Hartford, which was afterwards identified by the officers of the Bank of Union as being the money taken from the vault on the night the bank was burglarized.

Having previously burglarized the bank at Union, and a warrant for the arrest of Rudolph, the companion of the defendant, having been issued and placed in the hands of the sheriff, and the deceased being one of a number of persons selected by the sheriff to assist him in making the arrest, the evidence not only shows that the offense here charged was committed by Rudolph and Collins while resisting arrest, but also shows that they had determined between each other to use all possible means to avoid apprehension by any one which might lead to their conviction for burglarizing the bank,

as above stated, and to conceal the stolen property obtained by the burglary.

The plea of self-defense was interposed, and competent instructions were given upon that subject. Both defendant and Rudolph were charged with the murder in question in the same information, and, a severance being called for, the defendant was tried, which resulted in a verdict of guilty of murder in the first degree. After the court had instructed the jury of its own motion, defendant asked that the jury be further intsructed upon all the law of the case. The court declined further instructions, and defendant duly excepted. Defendant then prayed the court to give the following instructions:

"21. The court instructs the jury that the law guarantees to every person in this State the right to be secure in his person, papers, home, and effects from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by oath or affirmation reduced to writing. The court instructs the jury that in this case there is no evidence that Louis Vedder, B. F. Tichenor, Emanuel Cromer, and deceased, Charles J. Schumacher, or either of them, at the time of the alleged commission of the offense charged in the information, had any such warrant to search the Rudolph dwelling house mentioned in the evidence, or to arrest the defendant, Collins, or to seize his person or things; and if you believe from the evidence that said Schumacher, Vedder, Tichenor, and Cromer, with shotguns and pistols in their hands, attempted to enter the said Rudolph dwelling house by knocking and kicking upon the door thereof and shooting off their guns, or any one of them, to arrest the defendant, Collins, and one William Rudolph for burglarizing the Bank of Union and unlawfully carrying away the moneys and

other valuable things, the property of said bank, a felony which they had reasonable grounds to believe the defendant, Collins, and said William Rudolph had committed on the 26th day of December, 1902, and that said Vedder, Tichenor, Cromer, and Schumacher, or either of them, did not first give the defendant, Collins, or said William Rudolph, or other persons occupying the said dwelling house any information by what authority they were then acting, or any notice of their intention to arrest the defendant, Collins, or Rudolph for said felony—then such attempt to so enter said dwelling house to arrest them for said offense was an attempt to make an illegal arrest of said Collins and Rudolph, and they, the said Collins and Rudolph, had the right to resist such illegal arrest; and if you believe from the evidence that the defendant, Collins, under such circumstances shot and killed the deceased, Schumacher, then the jury will acquit the defendant, Collins, provided that under such circumstances the said Schumacher, Vedder, Tichenor, and Cromer, by their said acts, were giving the defendant, Collins, reasonable cause to apprehend that his life was in danger, or that they were about to do him great bodily harm, and that defendant, Collins, shot and killed said Schumacher to save his own life or to avoid such great bodily harm.

"23. The court instructs the jury that in law an arrest is made by the actual restraint of the person, or by his submission to the custody of the officer, under the authority of a warrant or otherwise. The officer must inform the person to be so arrested by what authority he acts, and must show also the warrant, if required. If, after the notice of the intention to arrest such person, he flee, or forcibly resist, the officer may use all necessary means to effect the arrest. The court therefore instructs the jury that in this case there is no evidence that the deceased, Schumacher, Vedder, Tichenor, and Cromer, or either of them, had any such

warrant to arrest defendant, Collins, on said 24th day of January, 1903, for any criminal offense. And the court also instructs the jury that in this case there is no evidence that said deceased, Schumacher, Vedder, Tichenor, or Cromer, or either of them, at or before the time of the killing of said Schumacher alleged in the information, gave the defendant, Collins, or William Rudolph any information by what authority they were then acting, or any notice of their intention to arrest the defendant, Collins, or Rudolph for any criminal offense.

"24. If the jury believe from the evidence that the deceased, Schumacher, Vedder, Tichenor, and Cromer, with shotguns and pistols in their hands, attempted to enter the dwelling house of one Frank Rudolph for the commission of any criminal offense, and if the jury further believe from the evidence that the defendant, Collins, did not know in what capacity the said Schumacher, Vedder, Tichenor, or Cromer were acting, or have any notice of their intention to arrest him, then such an attempt to arrest the defendant, Collins, was an attempt to make an illegal arrest of the defendant, Collins, and he had the right to resist such illegal arrest; and if the jury believe from the evidence that the defendant, Collins, under such circumstances shot and killed the deceased, Schumacher, then the jury will find the defendant, Collins, guilty of manslaughter, as explained in another instruction and assess his punishment in the penitentiary for a term of not less than three years nor not more than five years, unless the jury find that there was express malice on the part of the defendant Collins.

"25. If the jury believe from the evidence that Vedder, Tichenor, Cromer, and Schumacher, or either of them, did not inform the defendant, Collins, of the official position of said Vedder, and that he had the search warrant read in evidence, nor inform the defendant of its contents by reading the same, or by stat-

ing the substance of the same, and that in attempting to arrest the defendant, Collins, under the circumstances as explained in other instructions, the said Vedder, Tichenor, Cromer, and Schumacher by their said acts were giving defendant, Collins, reasonable cause to apprehend that his life was in danger, or that they were about to do him great bodily harm, and that he had reasonable cause to apprehend immediate danger of such purpose on the part of said Vedder, Tichenor, Cromer, and Schumacher being accomplished, and that the defendant, Collins, shot and killed the said Schumacher to prevent the accomplishment of such purpose, you should acquit the defendant on the ground that such shooting and killing was justifiable in law, because done in self-defense; and in order to acquit on the ground of self-defense it is not necessary that the danger should have been real or actual, or that such danger should have been actually impending, or about to fall on defendant. It is only necessary that the jury should believe that the defendant had reasonable cause to apprehend that there was immediate danger of a design to kill him or to do him some great bodily harm, and that the same was about being accomplished by said Vedder, Tichenor, Cromer, and Schumacher. But it is not enough that the defendant believed he was in danger. He must have reasonable cause to so believe; and if the defendant shot and killed Schumacher unnecessarily, or in resisting a lawful arrest, attempted in a lawful manner, there can be no self-defense in the case.

"26. If the jury believe and find from the evidence that the defendant, Collins, without a design to effect death, in the heat of passion, but in a cruel and unusual manner, shot and killed the deceased, Charles J. Schumacher, in resisting an illegal arrest of himself and William Rudolph at the county of Franklin and State of Missouri on the 24th day of January, 1903, then and there attempted to be made by Vedder, Tichenor, Cromer, and said Schumacher, as explained in

another instruction but not under such circumstances as to constitute excusable or justifiable homicide, then the jury will find the defendant guilty of manslaughter in the second degree, and so state in your verdict, and assess his punishment in the penitentiary for a term not less than three nor more than five years.

"27. The court instructs the jury that unless they believe from the evidence that Vedder, Tichenor, Cromer and the deceased, Schumacher, at the time they attempted to arrest the defendant, Collins, and Rudolph, disclosed to the defendant, Collins, or Rudolph, or other persons then in the dwelling house mentioned in the evidence, the official position of the said Vedder, and the fact of Tichenor, Cromer, and Schumacher assisting him and that said Vedder, or either of his said assistants, informed the defendant, Collins, or other persons in said house that said Vedder had a search warrant to search said house for moneys, the property charged to have been stolen from the Bank of Union by William Rudolph and some other unknown person on December 26, 1902, or informed the defendant or said Rudolph of its contents or the substance thereof, then the defendant, Collins, had a right to resist such attempted arrest, and to use such means as at the time were reasonably necessary to prevent said arrest.

"28. If you find and believe from the evidence dence and all the facts and circumstances proved in the case that one William Rudolph, did on the 24th day of January, 1903, at the county of Franklin and State of Missouri, assault, shoot and mortally wound the deceased, Charles J. Schumacher, with a certain pistol or Winchester rifle then and there loaded with gunpowder and leaden bullets, from which mortal wound the said Charles J. Schumacher did then and there die, then you will acquit the defendant.

"29. If you believe and find from the evidence beyond a reasonable doubt that on the 24th day of January, 1903, in the county of Franklin and State of Mis-

souri, the defendant, Fred Lewis, alias Fred Collins, with intent to kill Charles J. Schumacher, did feloniously, willfully, premeditatedly and of his malice aforethought make an assault upon the said Charles J. Schumacher, with a certain pistol then and there loaded with gunpowder and leaden bullets, and did then and there with said pistol willfully, premeditatedly and of his malice aforethought, but not deliberately, kill the said Charles J. Schumacher by shooting him upon the head and thereby inflicting upon him a mortal wound, of which said said wound the said Charles J. Schumacher did die, in said county of Franklin, in the State of Missouri, on the said 24th day of January, 1903—then you will find the defendant guilty of murder in the second degree, and so state in your verdict, and assess his punishment at imprisonment in the penitentiary for a period of not less than ten years.

"30. The court instructs the jury to disregard all that part of the testimony of Oscar Busch, Aug. Hoffmann, and William Meyerseick relating to the burglarizing of the Bank of Union and taking and carrying away the moneys and papers, the property of said bank, on the 26th day of December, 1903."

These instructions were refused, and defendant excepted. When the case was called for trial defendant presented an application for a continuance, which was overruled, and in this ruling defendant insists error was committed. The application was based upon the fact that the defendant had, by order of the court, been transferred from the county jail in Franklin county to the jail at St. Louis, and that his counsel who had been appointed by the court to defend him, had, in consequence of his removal, been deprived of the privilege of communicating with him with respect to matters necessarily connected therewith. It is alleged in the affidavit made by Leslie Cole, one of the attorneys for defendant, in support of the motion for a continuance, as follows:

"First.   Because this defendant is without counsel other than counsel assigned to him by this court on the —— day of March, 1903, being one of the days of the March term, 1903, of this court, and that at all time hereafter this defendant has been confined in the jail in the city of St Louis, State of Missouri, pursuant to an order of this court entered of record therein on said — day of March, 1903; that said jail is about sixty miles distant from the city of Union, the place of holding this court, and that said counsel so assigned to him reside and practice law in the county of Franklin aforesaid so that defendant has been separated from his said counsel at all said times, and by reason of said separation his counsel have been denied free access to this defendant, so that said counsel have had no opportunity, such as is provided by statute in such case to consult with this defendant concerning matters of his defense to the charge of the murder of one Charles J. Schumacher on the 24th day of January, 1903, alleged in the information pending against this defendant in this court.

"Second.   Because said said counsel did on the — day of June, 1903, make demand of the sheriff of Franklin county, the officer having charge or the right to have charge of this defendant, to afford counsel free access to this defendant at the jail in said county of Franklin, and that said sheriff refused until this 13th day of July, 1903, to afford said such free access to this defendant for the purpose of consulting about his said defense; a copy of which demand is hereto attached."

In support of this application the defendant filed a copy of the notice delivered to the sheriff soon after he was transferred from the jail at Union to the jail at the city of St. Louis, wherein the defendant's attorneys request that defendant be returned to the common jail of Franklin county for the purpose of consultation in the preparation of his defense.

To the affidavit filed by defendant the State   filed

the affidavit of Thomas Burch, sheriff of Franklin county, which, aside from the formal parts, is as follows:

"Thomas B. Burch on his oath states: That the demand upon him mentioned in defendant's application for continuance herein and his reply duly communicated in writing to each of defendant's attorneys will fully appear by the . . . the same being filed herewith and made a part hereof; that his answer to said demand was made to said attorneys for said defendant about three days after said demand. Said affiant further states that the said attorneys for defendant have never been denied access to defendant while defendant was in custody of this affiant. Said affiant further states that when said demand was made upon him he told J. H. Schaper, one of the defendant's attorneys, that he (the said affiant) would have said defendant in jail at Union, Missouri, by Wednesday last if the court consented, and that said attorney could then consult with defendant as fully as they desired; and that said Schaper replied that was not necessary; that they (the attorneys for defendant) would have plenty of time, as a jury would have to be summoned. This affiant further states that defendant was confined in the jail of St. Louis, Missouri, by order of this court, as alleged in this application for continuance, and not by authority of affiant; that affiant believes and states that he had no right to bring defendant from St. Louis jail to Franklin county, Missouri, without an order from this court, or the judge thereof in vacation, so to do."

A few days after the defendant was delivered to the keeper of the jail at the city of St. Louis, to-wit, June 26th, 1903, the sheriff of Franklin county replied to the notice which he had received from defendant's counsel as follows:

"In answer to your notice of this date requesting the return of the above named defendant to the county jail of Union, Missouri, so that you can more conven-

iently consult with him, I desire to say that said defendants are confined in the jail of the city of St. Louis, Missouri, upon an order of the Franklin County Circuit Court, made at the March term thereof, and you are at liberty to consult with him there at any and all reasonable times.    I will, if you desire that I shall do so, bring said defendant to the county jail of Franklin county a few days prior to the date of the trial, so that you may confer with them there at any time.''

The affidavit of the keeper of the jail at the city of St. Louis was also filed, in which he stated that defendant's counsel had at all times been given the right and privilege of communicating with the defendant for the purpose of preparing for a defense when the trial was had.

It will be observed that in the affidavit of the sheriff it is stated that when demand was made upon him by defendant's counsel to return the defendant to the jail at Union, in order that they might consult with him with respect to his defense, he informed them he ''would have the defendant in jail at Union, Missouri, by Wednesday (July 8th) last, if the court consented, and that said attorneys could then consult with the defendant as fully as they desired,'' and that one of defendant's counsel (Schaper) replied that they (the attorneys for defendant) ''would have plenty of time, as a jury would have to be summoned.''    This statement of the sheriff is not denied by counsel for defendant, and must be taken as true.    It is therefore clear that counsel for defendant were at no time denied ample opportunity to consult and fully advise with the defendant in and about his defense, and if they did not do so it was no fault of the sheriff in whose ostensible custody he was.    And when these facts are considered in connection with the well-settled law of this State to the effect that the action of the court upon an application for a continuance is a matter resting largely within its discretion, and that nothing short of an abuse of such

discretion will justify an interference by this court, we can not, in the absence of something indicating such an abuse, interfere. [State v. Parker, 106 Mo. 217; State v. Turlington, 102 Mo. 642; State v. Bailey, 94 Mo. 311; State v. Williams, 170 Mo. 204.]

One John Hensler was one of the panel of twelve jurors who sat upon the trial of the cause. Upon his *voir dire* examination the following occurred:

"Q. (By Mr. Booth): Where do you live? A. In Bowles township, Franklin county, Missouri.

"Q. Are you related to Charles J. Schumacher deceased? A. No, sir.

"Q. Or to Fred Collins, alias Fred Lewis? A. No, sir.

"Q. Not related to either of them? A. No, sir.

"Q. Have you formed or expressed an opinion as to the innocence or guilt of this defendant here? A. No, sir.

"Q. Do you know any of the facts in the case? A. No, sir .

"Q. Have you any conscientious scruples against inflicting the death penalty? A. No, sir.

"Q. Have you any bias or prejudice in this case one way or the other? A. No, sir.

"Q. Have you any opinion now as to the guilt or innocence of the defendant here? A. No, sir.

"Cross-examination by Mr. Schaper.

"Q. Have you read the newspapers? A. Yes, sir.

"Q. You read the account of what happened? A. Yes, sir.

"Q. What papers? A. I read the Globe-Democrat and the county papers; mostly the county papers.

"Q. Didn't the reading of these reports create in your mind a leaning against the defendant? A. No, sir. I believe not.

"Q. Did you say they did wrong? A. No, sir.

"Q. Didn't say they did wrong? A. No, sir. I

did not say anything.  I did not know if it was true in the paper or not.

"Q.  Why, there is not much use reading the papers, then?  A.  No, sir.

"Q.  Don't you read the papers for information?  A.  Yes, sometimes.

"Q.  Now, are you conscious of the fact that when you read these reports there was created in your mind an unfavorable opinion of this defendant?  A.  No, sir; because I just read it, and that is all.  I read lots of things that do not come out as you read them in the papers.

"Q.  Then you do not believe the things you read in the papers?  A.  Not all the time unless I am sure and certain of it.

"Q.  Do you remember reading in the newspapers or in the Globe-Democrat, a dispatch from Dixon, Missouri, on or about March 20th, giving an account of what happened to Schumacher?  A.  No, sir; I did not read all of it.

"Q.  You read some of it?

"A.  Yes, sir; but I did not read all of it.

"Q.  Did you express at that time that it was wrong, or words to that effect?  A.  Certainly, if it was so; but I did not know if it was so.

"Q.  The question is did that report make an unfavorable impression on your mind?  A.  No, sir; I do not see how it could.  I am certain it could not.

"Q.  Did you say whether or not they were guilty?  A.  No, sir.

"Q.  Did you say anything about it to your family?  A.  I said to my family that I did not know if they were the ones that killed him or not, I did not know, so I could not say.

"Q.  Afterwards did you say?  A.  I said when they were caught they might not be the men at all.

"Q. After you read this last account, then what did you say? A. I could not say how it was.

"Q. Then did you not say if they did it they were guilty? A. Of course, if they did it, of course.

"Q. Then you have delivered an opinion on the issues in this case concerning the death of Schumacher and you have expressed an opinion on that issue? A. Yes, sir; I expressed this: that whoever shot him was guilty, and that is a sure thing.

"Q. That, if the defendant was there he was guilty? A. Why, yes, if he was there.

"Q. That opinion is with you now? A. Yes, sir.

"(By Mr. Schaper): Your honor, I think the gentleman should be excused.

"The court: I think he is competent. You have gone out of the record in the examination of this juror."

The ruling of the court was excepted to at the time. It is apparent from the examination of this juror that he had neither formed nor expressed an opinion as to the guilt or innocence of the defendant, that he knew nothing about the facts connected with the homicide and had no opinion as to his guilt or innocence. And while he admited that he read the Globe-Democrat and county papers, he stated that it did not create a "leaning in his mind against the defendant." Nor did the fact that the juror stated on his cross-examination by defendant that "whoever shot deceased was guilty," "that if defendant was there" (meaning, of course, at the time), indicate that he was not an unbiased juror. Upon the contrary, his examination, taken as a whole, shows very clearly that he was an impartial juror, and qualified to sit upon the trial of the case. The trial court saw this juror, observed his manner, and its finding as to his qualifications as a juror in the absence of manifest error will not be disturbed. [State v. Williamson, 106 Mo. 162.]

Defendant contends that the admission of testimony in regard to the burglary of the bank at Union about a month before the homicide, over his objections, was manifest error, and that the judgment should be reversed upon that ground. There are many objections assigned by defendant to the admission of this testimony, but it will only be necessary, we think, to pass upon the theory upon which it was properly admitted. There is no question but that, as a general rule, testimony which tends to show that the defendant upon trial has been guilty of another and different offense from that for which he is being tried is not permissible. But where it becomes necessary to show a motive for the crime for which the defendant is upon trial, then a different rule applies, and testimony concerning another crime recently theretofore committed, and there exists a proper connection between the two offenses, then testimony with respect to the first crime is permissible for that purpose. The homicide was not committed until about four weeks after the bank was burglarized, and was therefore no evidence that the killing was committed in the commission of the burglary. But that fact would not render the testimony inadmissible if for any reason it was competent. In fact, this evidence constituted in part the history of the transaction. Defendant knew at the time of the killing that about a month before he had participated in the robbery of the bank, and that strenuous efforts were being made to discover who did it, with the purpose of apprehending and punishing the offenders, to prevent which he and his accomplice, Rudolph, were on the alert, and evidently well prepared to resist whoever might attempt it, and observing Schumacher and the deputy sheriff approaching the house in which they were, and in anticipation of their purpose, Rudolph ordered his mother and two sisters who were then in the house to go to the basement, and just as they had done so three of the four men, viz., Vetter, Cromer, and

Schumacher, went to one of the doors leading into the house; whereupon defendant and Rudolph went out of the house with weapons in their hands, and ordered the men to throw up their hands, which they did, but, notwithstanding their action in obedience to the command, they shot and immediately killed Schumacher. They then fled the country, and in about a month thereafter were apprehended in Hartford, Connecticut, at the time having upon their persons several large revolvers, among them one they had taken from Cromer at the time of the murder. Large sums of money were also found upon their persons, which was afterwards identified by the officers of the bank of Union as being the money taken from the vault at the time the bank was burglarized. It thus appears that the sequel to the burglary of the bank was the murder of Schumacher, and that the motive in so doing was to prevent arrest and punishment for the crime.

In McConkey v. Commonwealth, 101 Pa. St. 416, it was held that, if a murder is committed in an attempt to conceal stolen goods, evidence may be introduced at the trial tending to connect the murder with the robbery, in order to prove the motive and object of the crime, and as part of the history of the occurrence. So, in the case of the State v. Wintzingerode, 9 Ore. 153, it was held that evidence, if relevant to the issue in a criminal action, is not rendered inadmissible for the reason that it tends to prove the defendant guilty of a collateral offense.

In the case of People v. Molineux, 168 N. Y. 264, it is held that proof of another crime than for which a defendant is upon trial is competent to prove the specific crime charged only when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other; (5) the identity of the person charged with the com-

mission of the crime on trial. [State v. Spray, 174 Mo. 569.]

Whenever proof of motive is an essential ingredient of the evidence against the defendant in a criminal trial, the motive to be established is the one which induced the commission of the crime charged in the indictment. Our conclusion is that the evidence was clearly admissible for the purpose of proving a motive for the killing and the identity of the defendant.

The point is made that the information does not charge a conspiracy between William Rudolph and defendant, Collins, to kill and murder Schumacher, and therefore the admission of declarations made by Rudolph relating to the homicide were not admissible against the defendant. It is well settled that the declarations and admissions of an accomplice in crime, made while the conspiracy exists, are admissible in evidence against an accomplice, and in order to render such evidence admissible it is not necessary that the information allege that a conspiracy existed. [State v. Kennedy, 177 Mo. 98.] In the case at bar, however, Rudolph and the defendant, Collins, were charged as principals, and what Rudolph said during the transaction in which Schumacher was killed was admissible in evidence against Collins upon that theory. But even if it had been necessary to prove a conspiracy between Rudolph and Collins to resist arrest, it is evident from the facts and circumstances in evidence that such a conspiracy existed. In fact it would seem that there could have been no doubt about it.

There was no evidence, fact, or circumstance in evidence which authorized an instruction for any other degree of homicide than that of murder in the first degree. The killing was done with malice and deliberation, and was clearly murder in the first degree. The instructions which were given covered every feature of the case, and there was therefore no error committed in

refusing other instructions asked by defendant. [State v. Taylor, 171 Mo. 465.]

A final contention is that the court erred in overruling defendant's motion in arrest upon the ground that the information was not verified by the affidavit of the prosecuting attorney nor predicated upon the affidavit of some person competent to testify in the case, but no such point was made in the motion in arrest, which only went to the sufficiency of the information upon its face. Moreover, no objection whatever was made to the information before or during the trial, but an objection was made for the first time in the motion in arrest, and it was then too late.

Finding no reversible error in the record, we can but affirm the judgment and direct the sentence pronounced by the trial court to be executed. All concur.