STATE of Missouri, Respondent,

v.

Robert PIZZELLA, Appellant.

No. 68052.

Supreme Court of Missouri,
En Banc.

Jan. 13, 1987.
Rehearing Denied Feb. 17, 1987.

C. John Pleban, St. Louis, for appellant.

William L. Webster, Atty. Gen., Kevin B. Behrndt, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Transferred here by order of the Eastern District Court of Appeals, this cause, involving a challenge to the validity of a statute, falls within our exclusive appellate jurisdiction, Mo. Const. art. V, § 3.

The following facts gave rise to this proceeding: Sibley Williams (hereinafter Williams), a black male, was attending a "rock" concert on the evening of January 28, 1984 at the Arena in St. Louis. Williams testified that after purchasing refreshments at an Arena concession stand, he felt what seemed to be a stick thrust against his back inside his belt and was pulled away from the concession area through an exit door. Williams claims he was pushed against a wall and searched by two police officers, Robert Pizzella (hereinafter appellant) and William Meyer (hereinafter Meyer). That during this search he was taunted by racial insults, ordered to drop his pants and approximately $100 along with some controlled substances were taken from him by the officers. He, also, testified that they directed him to leave the Arena through a side exit; however, Williams returned to the front lobby of the Arena where he saw police officer Cox [hereinafter Cox] and informed him that two policemen had taken money from him. While he talked with Cox, appellant and Meyer came up and arrested him and either appellant or Meyer told Cox that Williams had escaped from their custody earlier in the evening.

Appellant and Meyer were charged by separate indictments with the class B felony of robbery in the second degree, under § 569.030, RSMo 1978. *State v. Pizzella* was docketed in the City of St. Louis Circuit Court as Case No. 841–01175 and *State v. Meyer* as Case No. 841–01176. The state moved for consolidation of the cases as authorized by § 545.880.1, RSMo Cum. Supp.1984 (hereinafter § 545.880.1) effective August 13, 1984, while appellant under the terms of Supreme Court Rule 24.06(a) moved for severance. The trial court relying on the language of § 545.880.1, denied appellant's motion, ordered that the defendants be tried together and in the trial that followed on March 25, 1985 each defendant was convicted on the lesser offense of stealing without consent § 570.030, RSMo Cum Supp.1984 (currently § 570.030 Noncum.Supp.1985).

Supreme Court Rule 24.06(a) (amended June 1980 effective January 1, 1981)[1] in vogue at the time of trial provided:

Any defendant *jointly charged* with one or more defendants with the commis-

---

1. Rule 24.06 has been amended again since appellant and Meyer were tried. The question of severance for defendants who are jointly charged is now governed by Rule 24.06(b).

sion of any felony other than under the provisions of Sections 566.030 or 566.060, RSMo, *upon his motion* made prior to the commencement of trial, *shall be tried separately.* In the absence of such a motion such jointly charged defendants shall be tried jointly or separately as the court in its discretion may order. (Emphasis added.)

As noted above, before the cause came for trial the legislature had enacted House Committee Substitute for Senate Committee Substitute for Senate Bill No. 602, (hereinafter Senate Bill 602) which included among its many parts and subparts § 545.-880.1, which provides:

*Notwithstanding supreme court rule 24.06,* whenever two or more defendants are *jointly charged in an indictment or information,* the court *shall order* both or all defendants *to be tried together.* In the event two or more defendants are charged in *separate indictments or informations* with offenses, where both the defendants and the offenses could have been joined in the same information or indictment, upon motion of one or more defendants or on motion of the state, the court *may order* the indictments or informations or both *to be tried together.* (Emphasis added.)

▮ Appellant first contends that § 545.-880.1, adopted subsequent to our Rule 24.-06(a) is by its terms and mode of enactment violative of Mo. Const. art. V, § 5 (1945 amended 1976)[2] and because the trial court erroneously followed the invalid statute instead of the mandate of our Rule, the trial court's denial of appellant's motion for a separate trial constitutes reversible error. He argues that the legislature in its attempt to annul Rule 24.06(a) through the enactment of § 545.880.1 failed to comply with the *"limited to the purpose"* man-

date of Article V, § 5, and hence § 545.-880.1 is invalid and should not have been relied on to resolve the issue of severance.

It is clear that the intent of the first sentence of § 545.880.1 was to annul Rule 24.06(a), for our rule *required* that a separate trial be had for a defendant "jointly charged" with one or more defendants with the commission of any felony (with certain specified exceptions) *if such defendant* prior to commencement of trial *moved* for severance. On the other hand, the first sentence of § 565.880.1 mandates a single trial for *multiple defendants* if they are "jointly charged in an indictment or information" and to this extent the first sentence of the statute stands contrary to and in effect would annul the Rule.

However here, the defendants were *charged in separate indictments* and it was not the first sentence of the statute, but the second, which applied, allowing the trial court to consolidate such charges and "order ... [that they] be tried together." In short it was this second sentence of the statute which controlled the case at bar and the provisions of *that* sentence do not conflict with or "annul" Rule 24.06(a) which relates only to jointly charged defendants. Hence the constitutional challenge to the mode of enactment is not germane to the operative portion of the statute and appellant is without standing to challenge the validity of the portion of the statute which has no application to his case.

"[N]ot just anyone has standing to attack the constitutionality of a statute" *Ryder v. County of St. Charles,* 552 S.W.2d 705, 707 (Mo. banc 1977), and to acquire the requisite standing, a litigant must be "adversely affected" by the statute he challenges. *Id.* In *State v. Williams,* 343

---

**2.** Article V, § 5 as amended in 1976 provides: **Rules of practice and procedure—duty of supreme court—power of legislature.** The supreme court may establish rules relating to practice, procedure and pleading for all courts and administrative tribunals, which shall have the force and effect of law. The rules shall not change substantive rights, or the law relating to evidence, the oral examina-

tion of witnesses, juries, the right of trial by jury, or the right of appeal. The court shall publish the rules and fix the day on which they take effect, but no rule shall take effect before six months after its publication. Any rule may *be annulled or amended* in whole or in part by *a law limited to the purpose.* (Emphasis added.)

S.W.2d 58 (Mo.1961), defendant argued that § 556.280(3), RSMo (1959) (hereinafter § 556.280(3)) was unconstitutional because it "deprive[d] *defendants* of their right to a trial by jury...." *Id.* at 61. (Emphasis added.) Williams lacked standing to attack § 556.280(3) because "[i]t ha[d] no application to any *fact* of [the] record...." *Id.* (Emphasis added.) In the case at bar appellant has similarly failed to show how the first sentence of § 545.880.1, though it may be subject to the charge of invalidity, has application to the facts of his case and that he has in any way been "adversely affected" by the enactment of that provision of the statute.[3]

█ Appellant next contends that § 545.880.1 is violative of due process, equal protection and his right to effective assistance of counsel because joinder is alleged to have precluded cross-examination of Meyer about a police report authored by him and Sergeant G. Roy (hereinafter Roy) which was admitted into evidence. Before ruling appellant's motion for severance the trial judge was required by § 545.880.2, RSMo Cum.Supp.1984 (hereinafter § 545.880.2) to consider the "probability for prejudice" to appellant in a joint trial. Section 545.880.2(4), provides that the trial court "shall find" that the "probability for prejudice" exists if:

> Severance of the joint defendants is necessary to achieve a *fair* determination of guilt or innocence of any defendant. (Emphasis added.)

Appellant's due process, equal protection, and effective assistance of counsel contentions may be reduced to an attack on the basic fairness of allowing defendants to be tried jointly as authorized by the second sentence of § 545.880.1. These matters were briefed and argued to the trial judge

prior to his ruling appellant's motion to sever and he was required to consider the basic fairness of a joint trial. Appellant contends that while the police report prepared by Officers Roy and Meyer might be admissible against Meyer, it was inadmissible as to appellant and the "spill over effect" as to appellant requires reversal in his case. We are unable, on the record before us to conclude that in a separate trial of appellant the police report would necessarily have been inadmissible. The fact that the report recounts an arrest made by both appellant and Meyer would provide the foundation for admission of the report as to Meyer. As will be discussed the fact of a conspiracy at the time of the stealing and immediately thereafter was supported by evidence developed in trial. Further the fact of a conspiracy in the promulgation and recording or filing of the report is supported by circumstantial evidence in the fact that Pizzella, though not its author, was as an arresting officer most certainly aware of its existence and content. Nothing in the record indicates that he made any effort to repudiate, contradict or change its terms. The trial court duly exercised its discretion in ruling the severance motion and no abuse of discretion has been shown, we hold such constitutional challenges without merit. *Cf. State v. Lincoln,* 482 S.W.2d 424, 426 (Mo.1972) (decision whether to grant separate trials to defendants separately charged is committed to discretion of trial court).

█ Appellant next asserts § 545.880.1 is an ex post facto law because the alleged criminal act was committed in January 1984, that he was indicted May 9, 1984 and § 545.880 only came into effect August 13, 1984. However the case was not tried until March 25, 1985, well after the effective

---

**3.** While appellant's lack of standing precludes reaching the merits of his challenge to § 545.880.1, under Mo. Const. art. V, § 5, the legislature may consider it prudent to review its practice of enacting a bill such as House Committee Substitute for Senate Committee Substitute for Senate Bill No. 602 when it seeks to annul a provision of our rules. Section 545.880.1 was a subpart of one of nine discrete provisions in § 1 of Senate Bill 602. A *multi-faceted* law such as

Senate Bill 602 which is not limited to the *singular objective* of annulling one of our rules may very well, under a logical extension of our decision in *State ex rel. K.C. v. Gant,* 661 S.W.2d 483 (Mo. banc 1983), run afoul of the "limited to the purpose" mandate of Article V, § 5. *See also, Miller v. Russell,* 593 S.W.2d 598, 604 (Mo. App.1979) (statute which provided for revisions in court structure as well as annulling a Rule held violative of art. V, § 5).

date of the statute, and an ex post facto law is one which "denounces as criminal acts which were non-criminal when committed or ... changes penalties for criminal violations after such violations are committed." *Lincoln Credit Co. v. Peach,* 636 S.W.2d 31, 35 (Mo. banc 1982), *appeal dismissed,* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983). Section 545.880.1 neither proscribes an act as criminal nor alters the penalty for any criminal violation, instead the applicable portion of the statute deals only with matters of procedure, i.e. the joinder for trial of separately charged defendants. In *State v. White,* 622 S.W.2d 939 (Mo. banc 1981), *cert. denied,* 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), the legislature had repealed § 545.180 RSMo (1978) and by reenactment altered the jury selection process by reducing the number of peremptory strikes to which defendant had been entitled at the time the crime was committed. We held that such change was merely procedural; accordingly neither the defendant *White* nor appellant here were victimized by the application of an ex post facto law.

Appellant's final constitutional attack on § 545.880.1 is that it shifted the burden of proof from the state to the accused. It should be noted that the contention appears only as a casual reference in appellant's brief without substantial development or explication of supporting rationale and on examining the entire record we find this contention is not well taken.

The next matter for consideration involves the admissibility of a police report authored by officers Meyer and Roy which recounted the arrest of Williams by appellant and Meyer. The report presents an account much more favorable to appellant and Meyer and substantially different from that found in Williams' testimony of the events at the Arena on the evening of January 28, 1984. However the state sought by use of the report to demonstrate a purpose on the part of Meyer, as one of the authors, to cover up and continue the conspiracy to conceal appellant's and Meyer's alleged criminal conduct. The report in essence states that appellant and Meyer had attempted to arrest Williams in a rest room for selling drugs and that initially he eluded them but was eventually apprehended. Appellant contends that the police report constituted hearsay and was not admissible under any exception to the rule. The state insists the report was an extension of the crime committed by appellant and Meyer and was part of a "cover-up attempt"; thus it was properly admitted against appellant as the admission of a coconspirator. Appellant claims the state failed to introduce sufficient evidence to support the proposition that appellant conspired with Meyer to steal from Williams or the theory of a continuing conspiracy to "cover up" the crime.

The statement of one conspirator is admissible against another under the coconspirator exception to the hearsay rule even when, as here, the defendants have not been charged with conspiracy. *State v. Lewis,* 181 Mo. 235, 261, 79 S.W. 671, 678 (1904); *United States v. Williams,* 529 F.2d, 557, 559 n. 1 (8th Cir.), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976). Statements of coconspirators made after the perpetration of a crime for the purpose of concealing the crime have been held admissible under the coconspirator exception to the hearsay rule. *State v. Hill,* 352 Mo. 895, 902, 179 S.W.2d 712, 716 (1944). Thus, the fact that the police report was prepared after Williams' money was taken may nevertheless be admissible as evidence of a "cover-up" of the crime committed by appellant and Meyer, if there was sufficient proof of conspiracy. Before the statement of a conspirator is admissible against a coconspirator "there must be a showing, by evidence independent of the statement, of the existence of [a] conspiracy." *State v. Cornman,* 695 S.W.2d 443, 446 (Mo. banc 1985). The state, however, is not required to present "conclusive evidence" that a conspiracy existed when it seeks to introduce into evidence the statement of one conspirator against another conspirator. *State v. Strait,* 279 S.W. 109, 113 (Mo.1925). A conspiracy may be established through circumstantial evidence. *Id.*

The *appearance* of "acting in concert" can provide sufficient circumstantial evidence of the existence of a conspiracy so as to allow for the application of the coconspirator exception to the hearsay rule. *State v. Peters*, 123 S.W.2d 34, 38 (Mo.1938).

The prosecutor's direct examination of Williams included the following:

Q Now, did you feel any touching of your pants area?

A Yes, I did. I felt after they had went through my front pockets, they went through my back pocket, somebody was going through my back pocket while somebody was going through my front pocket.

Q And did you feel the money leave, or did it stay in?

A My money, I felt my money, I felt everything coming out of my back pocket.

Q All right. And were your pants still up at that time?

A They were up then.

Q All right. Now, was anything being said at this time, did you say anything, first did you say anything?

A No, I was—

Q Why?

A I didn't know what they were going to do, you know.

Q Go ahead.

A You see, *they* had already told me not to say anything in the first place, and if I did say anything, *they* was talking about what *they* were going to do to me, so I didn't say anything.

\* \* \* \* \* \*

Q All right. You said nothing when you felt your money leave your pocket?

A *I asked them what were they doing. They told me to shut up and I just shut up.*

Q All right. *Did they put the money back in your pocket?*

A *No, sir.*

\* \* \* \* \* \*

Q Were you given your money back?

A No, sir.

(Emphasis added.)

Williams also testified on direct examination about his conversation with appellant and Meyer which occurred while they were transporting him to be booked as follows:

Q Did you say anything to them as you were driving around?

A Well, I asked them, you know, what was the charge, what was, you know, they're arresting me for.

Q What were you told?

A They just wouldn't say anything when I asked them that.

Q Did you mention your money to them?

A Once.

Q What did you say?

A *I just asked them, you know, why did they take my money.*

Q *Did you get an answer?*

A *No, I didn't.*

Q Was anything said to you about the money?

A *Told me not to say anything about the money.*

Q Who said that?

A *Both of them said it.*

(Emphasis added.)

The referenced testimony provides sufficient basis for a submissible fact issue on whether appellant and Meyer appeared to be "acting in concert" to deprive Williams of his money. During their search Williams said nothing because "they" had previously directed him to remain quiet. When Williams' money was taken out of his pocket, "they" told him to "shut up" and "they" did not return the money to Williams after the search. Finally, when Williams inquired, after his arrest, why "they" had taken his money "both" appellant and Meyer warned him not to mention the money to anyone. Throughout, plural and conjunctive references are employed to describe the taking and the retention of Williams' money. Additionally, the lack of response to Williams' inquiry to the arresting officers as to "why did they take my money" could be considered as a circumstance demonstrating acquiescence in the

conduct of one another. We conclude that Williams' testimony provided sufficient evidence to support admission of the report under the coconspirator exception to the hearsay rule.

We now turn to appellant's contention that the prosecutor's reference in argument to a "conspiracy of silence" amounted to improper comment upon appellant's election not to testify. During the opening portion of final argument the prosecutor made the following statement:

> The only thing they couldn't cover up was Jim Cox being an honorable man, remembering what he was sworn to do, remembering what he was sworn to do and going against the advice of one of the defense witnesses, Mr. Pedrotti, Officer Pedrotti, who said, "Jim, you want some good advice, stay out of it." He admitted that yesterday.
>
> THE COURT: Twenty-five minutes is up.
>
> COUNSEL: Thank you, Your Honor.
>
> Jim Cox broke, didn't he, *a conspiracy of silence within the police ranks.* He thought about it. He called his father who is a retired police officer, and he went to Internal Affairs and he told them what he knew. He didn't even know the man's name at that point. He didn't even know the man's name at that point.
>
> Do you think it's easy on him now? But he did what he had to do and he came in here and he told you about it along with Mr. Williams. (Emphasis added.)

During rebuttal the prosecutor again referred to a "conspiracy of silence."

> ... There's only fifteen men on Mobile Reserve, approximately fifteen men out there, according to Lieutenant Hollocher. There's only ten or twelve more like Jim Cox, Don Preston and Pedrotti out walking around.
>
> But no, they know something's up, maybe through their radio from Sergeant Roy, they know something's up, because they start looking for Sibley Williams after Jim Cox calls Sergeant Roy, don't

they? They're running around the lobby, they come out the front door, they look around, and as luck would have it, they didn't see him at that point, they didn't see Jim Cox and Sibley Williams standing by the pillar at that point, but they sure were looking. There's twenty-seven officers out there plus them, and they've got their own private little search party going on. Why?

> You can't imagine this *conspiracy of silence* that must exist. They were bold enough to write a report like this. They had Cox, *they hadn't assumed Cox.* What's Cox going to do? *But, boy, were they wrong. Boy, were they wrong.* Who do you want, these two men protecting the community, or people like Jim Cox? Nobody puts Sibley Williams in a rest room that night, do they? Nobody puts him in the back of the Arena running through a rear parking lot. None of the twenty-seven other officers or twenty-five other officers, however many there may have been. This report is an out-and-out lie to cover what they did to Mr. Williams before Jim Cox called Sergeant Roy. And it fails. (Emphasis added.)

> \*    \*    \*    \*    \*    \*

> Ladies and gentlemen, the City of St. Louis has a good Police Department. These two men aren't part of it, thank goodness. These two men dishonored their badge, these two men threw to the winds the oath that they took when they were given that badge, to protect the rest of us. So you don't have to feel bad about them. They took their action, their own will voluntarily, and they thought this *conspiracy of silence* would protect them and that they could do almost anything they wanted. They're a discredit to the Department and they've become by their actions part of the problem that we have, instead of the solution that we need.

> So I'm asking you not to let Sibley Williams down, I'm asking you not to let other Sibley Williams' down with your

verdict. I'm asking you not to let Jim Cox down. (Emphasis added.)

■ Argument by the state urging the "cogency and compelling force" of its evidence may cause a jury to observe the fact that an accused has not testified, this by itself, however, does not constitute improper comment. *State v. Hayzlett,* 265 S.W.2d 321, 324 (Mo.1954). In appellant's case, we believe the prosecutor's argument urged the jury to consider the "cogency and compelling force" of Cox's version of the events surrounding Williams' arrest. The prosecutor's comments referring to a "conspiracy of silence" when examined in context, were aimed at highlighting the fact that *Cox unlike other police officers* at the Arena on the evening of January 28, 1984 was willing to provide an account of appellant's actions which supported conviction and that he would not participate in the attempt to insulate appellant from the consequences of his wrongful conduct. The prosecutor's statement cannot be construed as an improper reference to appellant's failure to take the stand.

■ Appellant next contends the evidence was insufficient to support a conviction and that his motion for acquittal should have been granted. In our appellate review we do not weigh the evidence rather our function is "to determine whether there was substantial evidence, if believed by the jury, to sustain a verdict of guilty." *Peters, supra,* 123 S.W.2d at 36. "[A]ll substantial evidence offered by the state tending to implicate the accused [is to] be taken as true and every legitimate inference which may reasonably be drawn from such testimony should be indulged." *Id.* The record adequately supports the trial court's decision to submit the cause to the jury.

■ Finally, appellant asserts the trial judge abused his discretion when he removed for cause venirewoman Santoyo, whose husband was a detective with the St. Louis Police Department. On three occasions during voir dire Mrs. Santoyo stated that she would "hope" that she could be a fair and impartial juror despite the fact

that she was married to a St. Louis police officer. When the prosecutor asked Mrs. Santoyo whether it would be "less of a problem" for her if appellant and Meyer were acquitted she responded: "Yes." Finally, defense counsel asked Mrs. Santoyo if in a "close case" whether being married to a St. Louis police officer might impact upon her willingness to acquit to which she responded: "It could."

In reviewing the qualifications of a venireman the trial judge has "a very wide discretion and his rulings [are] not [to] be disturbed unless they are clearly and manifestly against the evidence." *State v. Jones,* 384 S.W.2d 554, 558 (Mo.1964). We have previously acknowledged the special nature of the relationship that exists between husband and wife through our observation that "[n]o more confidential relation is known to the law than that of husband and wife." *Hickman v. Link,* 97 Mo. 482, 493, 10 S.W. 600, 607 (1889). Mindful of the unique character of the relationship existing between spouses as well as the equivocal responses provided by Mrs. Santoyo we are unwilling to say her removal for cause constituted a clear abuse of discretion.

The judgment of the trial court is affirmed.

All concur.