STATE of Missouri,
Plaintiff/Respondent,

v.

Curtis J. LASLEY,
Defendant/Appellant.

No. 51859.

Missouri Court of Appeals,
Eastern District,
Division Two.

April 21, 1987.

Motion for Rehearing and/or
Transfer Denied
June 2, 1987.

Application to Transfer Denied
July 14, 1987.

Nancy A. McKerrow, Columbia, for defendant/appellant.

William L. Webster, Atty. Gen., Jatha B. Sadowski, Asst. Atty. Gen., Jefferson City, for plaintiff/respondent.

REINHARD, Judge.

Defendant appeals after being convicted by a jury of second degree assault and sentenced as a prior offender to 6 years imprisonment. We affirm.

Defendant challenges in his principal point on appeal the sufficiency of the evidence to convict him of second degree assault. In determining whether there was sufficient evidence, we accept as true all evidence, circumstantial or direct, tending to prove defendant guilty together with all reasonable inferences which support the verdict. We must determine whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged. *State v. Dunavant,* 674 S.W.2d 685, 687 (Mo.App.1984).

With those precepts in mind we examine the evidence supporting the verdict. The state's principal witness was the victim of the alleged assault, Missouri Highway Patrolman Dennis Williams. Williams testified that on the evening of July 8, 1985, he set up a radar patrol on Highway 61, approximately 4 miles north of Hannibal. At about 9:40 p.m. he heard a squeal and noticed a red sports car travel past him southbound at 114 miles per hour.

Williams immediately attempted to pursue the speeding vehicle and activated his lights and siren. When the red sports car reached a point approximately a quarter of a mile north of the Hannibal city limits, it took a sharp turn and proceeded toward the Hannibal business district. Williams continued his pursuit and at one point got close enough to obtain the sports car's license number. The sports car entered a residential area, ran several stop signs, skidded sideways and struck another vehicle, then came to a stop at an intersection. The driver exited the car and began running. After ascertaining that there were no passengers remaining in the abandoned car, Williams pursued the driver on foot. The driver ran behind some houses and Williams was able to remain within twelve to twenty feet from him. Williams lost sight of the driver behind a tree, but spotted him again off to the left and the two men began running parallel to each other.

As the chase continued, Williams heard a gunshot which he believed came from his left and approximately 40 feet away, near the location where he had last seen the driver. Williams testified that he was familiar with firearms from his training and that there was "no question" that the sound he heard was the report of a small caliber handgun. Upon hearing the shot, Williams drew his service revolver and continued running in the direction of the driver's silhouette. Williams tripped over a stump, and as he fell he continued looking to his left, where he had last seen the driver. At that point he heard another gunshot and saw a "muzzle-blast." He could see the driver's silhouette, and it appeared that the driver was still running and had his arm extended towards Williams. Williams testified, "[t]he sound just sounded close. *I seen a silhouette with an arm facing me and a flash. I feel certain I was being shot at.*" Williams regained his balance and, by the time he was able to aim at the location where he had last seen the driver's silhouette, the driver had moved. Williams then noticed the driver about twenty feet to his right. The driver ran across a street, and

Williams observed, from the illumination provided by the street light, that the person he had been chasing on foot was the same person who had exited the sports car. Williams also noticed that the driver's "right hand was clenched in the same manner you would hold a gun," and the driver was holding a small bag in his left hand. The driver was not apprehended that evening.

Patricia Kitchell and her sister, Bonnie Gee, also testified for the state at trial. Kitchell was defendant's girlfriend at the time of the offense and at the time of trial. In July 1985 she and her sister resided together in a trailer in Quincy, Illinois. Late on the night of July 9 or just after midnight July 10, defendant came to the sisters' trailer asking for a place to stay. Kitchell refused defendant's request at that time, but ultimately relented a few days later and allowed defendant to stay at the trailer. Defendant told Kitchell and Gee that he had been to Hannibal and had attempted to hitchhike back but had ended up walking most of the way, causing his feet to blister. Kitchell and Gee testified that when defendant was drunk he would "brag" about outrunning the police and tell people he was the driver of the red sports car mentioned in news reports of the incident. During defendant's stay at the trailer, Gee cut his hair and Kitchell dyed it. Defendant also changed his appearance by parting his hair in the middle rather than on the side.

■ We believe this evidence was sufficient to support the submission of the instruction on second degree assault. Williams's testimony indicated that the driver of the sports car fired two gunshots, at least one of which was aimed at the trooper. Gee and Kitchell testified to facts indicating that defendant was the driver of the red sports car involved in the incident. Thus there was evidence permitting an inference that Williams was assaulted with a deadly weapon and defendant was the perpetrator of the assault.[1] Defendant's point is denied.

We next address defendant's contention that the court erred in allowing the admis-

---

1. Defendant cites *State v. Feast,* 588 S.W.2d 158     (Mo.App.1979) as an example of a case involv-

sion of testimony by Kitchell and Gee that defendant went to Hannibal on July 8, 1985, "to pick up drugs."[2] Defendant raised the issue of the admissibility of testimony connecting his trip to Hannibal with a drug transaction in a "motion for protective order" prior to trial. The state argued that the evidence was admissible to show motive and the court denied defendant's motion. The following exchange then ensued:

[DEFENSE COUNSEL] Well, I would like, then, an objection to reference to the drugs to run through his opening statement because I don't think the evidence is going to be anywhere near as clear-cut as [the prosecutor] has outlined to the Court. But, you know, but once it is in there through his opening statement, it is in there, and we would like a continuing objection to run starting at the time of his opening statement.

[THE COURT] I will allow your objection to run through it all, but I am sure [the prosecutor] will act in good faith and will say nothing in his opening statement he doesn't expect his evidence to meet, and *this ruling, of course, is just on the Protective Order. It will be subject, as well, to the specific objections, Mr. Motley [defense counsel], and I will take up those. Obviously, some objections might be proper on some of the evidence and not proper on others,* and I will certainly rule each item on evidence that is received because there might be some matters which would not be appropriately admissible to show motive.

(Emphasis ours.)

■ Pre-trial rulings on motions in limine are, of course, interlocutory in nature. To properly preserve his objection, the opponent must object to the evidence he seeks to exclude at trial. *State v. Woods,* 639 S.W.2d 818, 820 (Mo.1982). Despite defendant's request that his objection be continuing, the court specifically stated that it expected specific objections to be made at the appropriate time. Defendant made no specific objections and therefore did not preserve his point for appellate review.

■ Furthermore, had the issue been preserved it would have been without merit. Evidence of crimes other than the crime charged, although generally inadmissible, is admissible when it tends to establish motive. *State v. Reasonover,* 714 S.W.2d 706, 715 (Mo.App.1986) The testimony of Gee and Kitchell indicating that defendant went to Hannibal to engage in an illegal drug transaction was relevant to show his motive in fleeing from and assaulting the officer. Without that evidence it would have appeared that the state was asking the jury to believe that defendant fired shots at Patrolman Williams to avoid receiving a speeding ticket. Such was not the case, as indicated by the testimony defendant sought to exclude. We believe the trial court did not commit error, plain or otherwise, in admitting the testimony about defendant's illicit reason for his excursion to Hannibal.

■ Finally, defendant asserts that the trial court erred in denying his motion for mistrial "based upon the improper communication" between Patrolman Williams and Junior Cardwell, who was one of the jurors. The incident referred to was brought

---

ing evidence sufficient to support the submission of an assault instruction hypothesizing that a defendant "shot at" the victim. Like Patrolman Williams in the case at bar, the victim in *Feast* heard the gunshot and saw a "flash." The victim also heard "what sounded like a bullet go past and hit just behind him." In addition there was evidence connecting a spent .38 slug found at the scene with defendant's gun. While *Feast* involved some evidence not presented here, we find no indication in *Feast* that the evidence in this case is insufficient to support the conviction.

2. There was conflicting evidence presented as to whether defendant went to Hannibal to purchase drugs or to sell them. Kitchell testified that she was not sure if defendant intended to pick up "cash" or "stash." Defendant told her that he had remarked to his employer, while in a bar in early July, either that he would "be back in a flash with the cash" or "back in a flash with the stash."

to the attention of defense counsel by the prosecutor, who observed Williams conversing with Cardwell during a noon recess after opening statements and prior to the introduction of evidence.

Counsel informed the court about the situation and Williams and Cardwell were questioned about what had occurred. Both men testified that the conversation lasted only a few minutes, pertained to fishing, and did not involve any aspect of the case being tried. Cardwell testified that there was nothing in the conversation that would make him sympathetic to Williams or influence his determination of the case. Neither man was aware that the other was involved in the trial. The court ruled that the encounter was innocent and did not prejudice defendant.

Although the state bears the burden of showing that a juror who engages in an unpermitted communication was not subjected to an improper influence, we believe the state met its burden in this case. *State v. Martin*, 624 S.W.2d 879, 882 (Mo.App. 1981). Here, as in *Martin*, the colloquy, while improper, was casual, brief and totally unrelated to anything associated with the trial. *Id.* There was no prejudice to defendant, and the court did not abuse its broad discretion in refusing to declare a mistrial because of this harmless encounter.

Judgment affirmed.

SMITH, P.J., and DOWD, J., concur.