**STATE of Missouri, Plaintiff–Respondent,**

v.

**Anthony LEISURE, Defendant–Appellant.**

**Anthony LEISURE, Movant–Appellant,**

v.

**STATE of Missouri, Respondent–Respondent.**

**Nos. 53836, 57841.**

Missouri Court of Appeals, Eastern District, Division Three.

April 23, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 22, 1991.

Application to Transfer Denied July 23, 1991.

James S. McKay, David C. Hemingway, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

STEPHAN, Judge.

Anthony Leisure ("Anthony") appeals from his conviction, after a nine day jury trial, on one count of murder in the first degree, Section 565.001, RSMo 1978 (repealed 1984), in the death of James Anthony Michaels, Sr. Additionally, Anthony appeals the dismissal of his Rule 29.15 motion for post-conviction relief. We have consolidated Anthony's two appeals, pursuant to Rule 29.15($l$). We affirm.[1]

At the outset, we note that the victim was the head of an organized crime entity described as being composed of persons of Syrian or Lebanese ancestry. The State's theory of the case was that Anthony wanted to maintain control of Local 110 of the Laborer's International Union of North America ("Local 110") against incursions by victim and the "Italians", while taking over the leadership of the Syrian organized crime faction. The evidence adduced in the light most favorable to the verdict is as follows. In 1966, Anthony began working as a laborer for Local 110. He worked in

---

**1.** The record on appeal consists of the following: (1) the transcript of pre-trial motions; (2) the eight volume transcript of Anthony's trial; (3) the transcript of the hearing on Anthony's motion for new trial; (4) the transcript of Anthony's sentencing; (5) the transcript of the hearing on (a) the Agreement on Detainers and (b) the State's motion to dismiss Anthony's motion for post-conviction relief pursuant to Rule 29.15; (6) the two volume trial legal file; and (7) the legal file regarding Anthony's Rule 29.15 motion.

this capacity until 1970, when he was appointed as a union organizer. In 1973 or 1974, Anthony became a business agent for Local 110. Though technically these were the job titles Anthony held, there is evidence that he was no more than a chauffeur and bodyguard for Raymond Massud ("Raymond"), the business manager at Local 110.

Raymond promised Anthony that Anthony would succeed him as the business manager at Local 110. However, in 1977, while Raymond was in the hospital with a terminal illness, Raymond called his son, John Massud, and Anthony to his bedside. Raymond told Anthony that he had a change of heart. Raymond proposed to make Anthony assistant business manager, with John Massud serving as business manager. Under this arrangement, ("the arrangement") Anthony was to control the hiring and firing, while John Massud was to take care of the office affairs.

Raymond died on June 30, 1977. That same day, the appointments of John Massud as business manager and Anthony as assistant business manager were confirmed by Local 110's executive board. Shortly after Raymond's death, Anthony's brother John Paul Leisure ("John Paul") and Fred Prater ("Prater") contacted an associate named Ronald Joseph Broderick ("Broderick"), and asked him to join Local 110 to help Anthony out if he got into trouble. Broderick ultimately agreed, and Anthony appointed him union organizer in July of 1977.

In 1978, John Massud began violating the arrangement. John Massud hired Vince Giordano ("Vince") as a business agent in January, 1978. When Anthony approached John Massud to inquire about Vince's hiring, John Massud explained that he hired Vince as a favor to Vince's uncle, Anthony Giordano, the reputed head of an organized crime group in St. Louis referred to as the "Italians". On May 11, 1979, another nephew of Anthony Giordano, Michael Trupiano, became president of Local 110. Thereafter, John Massud hired his own son. Finally, John Massud hired James Anthony Michaels, III.

After this last appointment, Anthony held a meeting at his home in Hillsboro, Missouri. The attendants were Anthony, John Paul, Anthony and John Paul's cousin: David Leisure ("David"), Broderick, Prater, John Ramo ("Ramo") and Charles "Obie" Loewe ("Loewe"). The discussion centered around whether the group should kill John Massud for violating the arrangement. A vote was taken on this issue, however, the group decided not to kill John Massud. The group felt that since John Massud was related to Gene Slay, they might lose Gene Slay's money and political powers. Moreover, John Paul felt that John Massud and Michael Trupiano were so close that by killing John Massud, they might start a war with the "Italians".

Later in 1980, John Massud indicated that the union payroll was too high and that he planned to fire Broderick, the only business agent Anthony appointed. The group, with the exception of Loewe, held a second meeting at LN & P, Incorporated, a tire service, towing service and tractor leasing operation owned by Anthony, John Paul, David and Prater. The group discussed plans to kill somebody, to prevent Broderick from losing his job. Although the group discussed many potential targets, the group decided to kill James Anthony Michaels, Sr.

Initially, the group planned to shoot him at Spic's Restaurant, his favorite breakfast establishment. Eventually, due to problems in carrying out the plan, the group discarded it. A second plan evolved whereby victim would be car bombed.

Prater constructed a remote control bomb using a device designed to remotely pilot model airplanes. Thereafter, Prater, Ramo, Broderick and Anthony tested the unit, using a practice light on the device to signal when it was triggered. On September 4, 1980, David and Ramo stole a 1979 Chrysler Cordoba, which matched the make and model of victim's vehicle, in order to practice planting the bomb. At the same time, Anthony and others followed victim.

On September 17, 1980, Loewe drove Ramo to a National Supermarket, where they met Anthony and Broderick. Antho-

ny, Ramo and Broderick got in Broderick's son's van. The three subsequently met up with David.

Thereafter, the group of four drove to LN & P and picked up the bomb. The four then drove to St. Raymond's church. There, they saw victim's Chrysler Cordoba. When a space opened up next to victim's vehicle, Broderick parked the van. David thereafter got out of the van and planted the bomb under victim's car. When David returned to the van, the four, with Ramo at the wheel, drove out of St. Raymond's parking lot and parked on the street. During this time, Loewe patrolled the area in a radio-equipped tow truck, to watch for police. John Paul additionally monitored the radio in the LN & P office, so he could radio Loewe if anything happened.

When victim exited St. Raymond's, the four discussed killing victim right there in the church parking lot. However, the group abandoned that idea. Victim then drove away, followed by the van. A short distance from the church, Anthony triggered the remote control device, but the bomb did not go off. The four continued to follow victim as he drove south on Interstate 55, in St. Louis County. As victim approached the exit he regularly took to his home, his car exploded, killing victim.

After the bombing, the four drove to Illinois and back to Missouri, taking a number of measures to remove traces of the explosion from themselves and the van. Anthony, John Paul, David, Ramo, Broderick and Prater subsequently attended victim's wake, as a show of power. At some point, Francis Michaels, victim's brother and a member of Local 110, approached John Paul Leisure and told him that if anybody wanted his (Michaels') job, all they had to do was ask.

Joe Giordano ("Joe"), Vince's father, also approached John Paul. Joe said he wanted Vince to keep his job with the union. John Paul told Joe that Vince did not have to worry about his job.

Additionally, John Paul met with John Vitale, who succeeded Anthony Giordano as the head of the "Italians", following Giordano's death in the summer of 1980.

John Paul told Vitale that Local 110 would remain a Syrian union. He also indicated that he would handle all of the Syrian business in town, and Vitale could take care of the "Italian" matters.

After victim's death, Anthony fired James Anthony Michaels, III. Francis Michaels was also forced out of the union.

Anthony was charged by indictment on May 22, 1985, with two counts of capital murder, Section 565.001, RSMo 1978, and two counts of assault in the first degree, Section 558.011.1(1), RSMo 1978. A subsequent information, in lieu of the indictment, was filed on December 30, 1986. Both the indictment and the substitute information named additional co-defendants in the murders and assaults as charged. The court subsequently ordered: (1) that the defendants all be severed for separate trials; and (2) that the counts against Anthony be severed with the result that Anthony's role in victim's murder be tried alone.

At trial, Anthony and two other witnesses testified that Anthony did not participate in the murder, but was elsewhere at the time. The jury subsequently found Anthony guilty of capital murder. The court held a separate hearing on punishment, during which time both the State and Anthony presented additional evidence. The jury returned a sentence of life imprisonment without the possibility of parole for fifty years.

On October 2, 1987, Anthony filed his notice of appeal. On June 27, 1988, Anthony filed his *pro se* motion for post-conviction relief, pursuant to Rule 29.15. In an order dated September 8, 1988, the trial court appointed the Public Defender's Office of the City of St. Louis to represent Anthony in his post-conviction effort. On September 15, 1988, the Public Defender's Office made a *pro se* determination that it could not handle Anthony's post-conviction efforts due to a conflict of interest. It therefore reassigned Anthony's case to the Special Public Defender's Office. In a letter dated September 22, 1988, the Special Public Defender's Office requested that the State Public Defender's Office in Columbia, Missouri handle Anthony's post-conviction

relief due to a conflict of interest. On September 30, 1988, the Special Public Defender's Office received official notification from the State Public Defender's informing the Special Public Defender's Office that it was responsible for handling Anthony's case.

On November 14, 1988, a member of the Special Public Defender's Office filed a first amended motion and a request for an evidentiary hearing. An amendment to counsel's amended motion was also filed, four days later. The State subsequently moved to dismiss Anthony's Rule 29.15 motion as untimely. At a hearing on the motion to dismiss, the court denied the motion, holding that the time for filing an amended motion under Rule 29.15 would run from September 30th, 1988, the date the Special Public Defender's Office received official notification from the State Public Defender's Office that it was responsible for handling Anthony's case. In so holding, the trial court determined that both Anthony's amended motion and his amendment to his amended motion were timely. The trial court granted the State ten additional days to file an amended motion to dismiss.

On December 21, 1988, the Public Defender's Office of the City of St. Louis orally requested to be removed as Anthony's counsel, due to a conflict of interest. This motion was offered simply to show that the Public Defender's office was no longer Anthony's counsel.

On December 30, 1988, the State filed an amended motion to dismiss. By consent of the parties, the only evidence in support of Anthony's motion beyond notice of the trial record, was a set of interrogatories that Anthony answered and filed. On November 30, 1989, the motion court issued findings of fact and conclusions of law, denying Anthony's motion. The motion court noted that it considered both Anthony's amended motion and his amendment to his amended motion because the trial court had so done, as it was without precedent interpreting the new time limits imposed by Rule 29.15. Anthony currently appeals

both his conviction and the denial of Rule 29.15 motion.

■ Anthony's first point on appeal is that the court erred in denying Anthony a new trial when Anthony demonstrated that a deputy sheriff took approximately half of the jury to the Gateway Arch, Hyde Park, the Crown Candy Company, a National Supermarket and her home on a Sunday afternoon while the jury was supposed to be sequestered. Anthony initially made a motion for a new trial based on alleged juror misconduct on September 11, 1987. The motion was continued to September 25, 1987. This was done to permit the attorneys to further investigate the alleged misconduct. At the second hearing, the parties entered into a stipulation of facts. That stipulation reveals the following.

On Sunday May 17, 1987, the trial judge granted the deputy sheriff, who was in charge of the sequestered jury, permission to take some of the jurors to a park because they were getting "stir crazy." Initially, the deputy sheriff took the jurors to the Gateway Arch. The jurors walked around, but did not talk to anyone in particular. From there, they went to the deputy sheriff's house where she showed them her dogs and other animals. At that time, or perhaps in their second trip to the deputy sheriff's house, they met the deputy sheriff's son, daughter and grandaughter. Their conversation was limited to greetings and pleasantries about the granddaughter. There was no discussion about the trial or the proceeding in which they were involved.

From the deputy sheriff's house, the group went to Crown Candy Company, where a television set, broadcasting a Cardinals baseball game, was on. The jurors neither saw news reports relating to this trial nor talked to any outside individual. The group then went to Hyde Park. At the park, there was contact between the group and a couple with a small child. Again, the conversation was limited to pleasantries, mostly about the child. There was no discussion about the trial.

At some point, the group returned to the deputy sheriff's house. The deputy sheriff

went into her house to get her uniform. In her absence, none of the jurors talked to anybody about the case.

The group then went to a National Supermarket. Some of the jurors stayed with the deputy sheriff in the front of the store, some of the jurors shopped in small groups, and some of the jurors shopped separately. One juror indicated that the deputy sheriff took a vantage point in the front of the store where she could view all of the jurors as they shopped. All of the jurors indicated that they did not talk to anyone in particular about any aspects of the case. The group subsequently left the supermarket, thereafter returning to their hotel.

After the trial court heard the stipulated facts, the trial judge indicated that although he did grant the deputy sheriff permission to take the jurors to a park, he had not intended that the deputy sheriff separate from the jurors or permit them to separate from each other. Additionally, he indicated that the situation should not be countenanced in any way. The trial judge concluded, however, that there was no contact between the jury and other individuals who in any way attempted to influence the jurors in deciding the case. The trial judge also concluded that the conduct of the deputy sheriff in permitting some of the jurors to separate did not influence the jury's decision.

■ The granting of a new trial based upon juror misconduct is within the discretion of the trial court. *State v. Walker*, 753 S.W.2d 44, 46 (Mo.App.1988). We will only set aside a trial court ruling if the trial court abused its discretion. *Id.* The trial court is in a better position to determine whether an alleged incident of jury misconduct prejudiced the defendant. *State v. Mitchell*, 651 S.W.2d 637, 639 (Mo.App. 1983).

■ While there is evidence that the jury was separated, mere physical separation of the jury for their better accommodation does not violate the rule forbidding a separation, provided that they remain in the custody and under the surveillance (not necessarily ocular) of the officer in charge.

*State v. Hayes*, 637 S.W.2d 33, 38 (Mo.App. 1982). Thus, the absence of the deputy sheriff for a few minutes at her home, or the possibility that some juror might have been briefly out of her sight at the National Supermarket, does not constitute a separation of the jury under Section 546.230 RSMo (1986) (repealed 1989). Moreover, there is no indication that the jurors were improperly influenced. The jurors' contact with outside individuals was casual, brief and totally unrelated to anything associated with the trial. *State v. Lasley*, 731 S.W.2d 357, 360 (Mo.App.1987). Since we are unable to conclude that the trial court abused its discretion, Anthony's first point is denied.

Anthony's second point on appeal is that the trial court erred in refusing to strike venire member Lester Moehrle for cause based upon his views on capital punishment. Specifically, Anthony argues that Moehrle's answers in total revealed a firm predisposition favoring death and a substantial likelihood that he would not follow the statutory scheme prohibiting the jury from considering the death penalty unless it finds an aggravating circumstance beyond a reasonable doubt. Anthony contends that he was prejudiced because he was forced to use a peremptory strike to exclude Moehrle.

■ It is well-established that a defendant is entitled to a full panel of qualified jurors before being required to make peremptory strikes. *State v. Wacaser*, 794 S.W.2d 190, 193 (Mo. banc 1990). It is prejudicial error if the court fails to sustain a meritorious challenge for cause. *Id.* The proper standard for determining whether a venireperson may be removed for cause during death qualification is whether the venireperson's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *State v. Sloan*, 756 S.W.2d 503, 505 (Mo. banc 1988), 779 S.W.2d 580 (Mo. banc 1989), *cert. denied* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236, *cert. denied* ―― U.S. ――, 110 S.Ct. 1537, 108 L.Ed.2d 776. Thus, if a venireperson has views on the death penal-

ty which would prevent or substantially impair him from realistically considering either a death sentence or a life sentence he may properly be excused. *State v. Murray,* 744 S.W.2d 762, 768 (Mo. banc 1988), *cert. denied* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). In Missouri, a juror must be able to consider both alternatives. *Id.*

■ The issue of whether a venireperson may be removed for cause on the issue of death qualifications should be based on the entire voir dire examination, not on a single response. *State v. Sloan, supra,* 756 S.W.2d at 505. Considerable discretion lies with the trial court in determining the qualifications of venirepersons. *Id.* Absent an abuse of discretion, we will not overturn the trial court's ruling. *Id.* at 506.

■ Here, venireperson Moehrle was questioned four times, at length, regarding his views on the death penalty. First, he was questioned by the prosecutor. In that exchange, Moehrle stated that he believed the death penalty is appropriate where the individual takes the life of another. He also indicated that he would consider life, depending on the facts of the case. Defense counsel then questioned Moehrle. The following conversation occurred:

Q. [by defense counsel to Moehrle] ... I think what you're telling me is that under those circumstances if it was a deliberate murder you would be inclined to vote for death?

A. I would be inclined, that's correct.

Q. And also that you would feel death was appropriate punishment?

A. Right.

Q. And barring very unusual circumstances you would not be inclined to vote for life?

[objection by prosecutor] Well, Judge, I'm going to object to interjecting that particular phrase into what he said. He was never asked about circumstances where he might consider something else other—

[the court] I'll let the witness answer if he can. If he can answer as to

whether or not other circumstances would let him consider life.

A. Let me say this. If I were on that and we deliberated and we got down to where it was eleven to one for life then I would probably change my vote.

Q. Okay. In other words if you were in a significant minority?

A. Right.

Q. But barring that if it was deliberate murder you would vote death?

A. Right.

Q. And life is not the punishment you would consider unless you were just basically in a significant minority on the jury?

A. I would be ninety percent inclined to vote for the death penalty.

Thereafter, defense counsel moved to strike Moehrle for cause. The trial judge decided to "hold that ruling in abeyance to see where we're going with this particular subject." Subsequently, the prosecutor again questioned Moehrle. During this exchange the prosecutor explained that he would have to prove additional factors before the jury would even have the authority to impose the death penalty. After hearing this, Moehrle stated: "[w]ell, the Judge is going to give us instructions to that. Well, I said earlier I would follow the Judge's instructions." Later, Moehrle indicated he would look at all of the facts, and was not close minded about the possibility of death.

Finally, defense counsel again questioned Moehrle. Moehrle assured defense counsel that he would look at all the circumstances before deciding whether to impose either a life sentence or death. Shortly thereafter, the trial judge denied Anthony's motion to strike Moehrle for cause. The judge stated:

I believe that there has been considerable confusion among the jurors with regard to their duties and particularly the second phase what they will be instructed on and what the alternatives will be and I understand the need for asking leading questions in order to find out attitudes and personality traits for jurors which would be helpful in making strikes. These—the questions that have been

asked certainly lead to information which would be helpful in that regard. They also lead to circumstances under which the court has to make a determination whether or not the jury could be fair and consider all alternatives particularly in the area of punishment that we're discussing right now. I believe under the totality of the answers that were given by [Moehrle] he would be a fair juror to the extent that he would consider the alternatives to the death penalty although he did frankly state he favored the death penalty....

■ Giving due regard to the trial court's opportunity to view the demeanor of and hear Moehrle's testimony, our review of the record reveals no abuse of discretion. Although a venireperson who would automatically vote to impose a death sentence upon a finding of guilt regardless of the circumstances may be challenged for cause, if the record reflects his assent to follow the court's instructions and a willingness to consider both penalties authorized for capital murder then no resultant error occurs in the non-removal of that venireperson from the panel. *Kenley v. State*, 759 S.W.2d 340, 352 (Mo.App.1988). Since Moehrle indicated that he would follow the court's instructions and would consider both penalties, no error occurred. Moreover, as was amply pointed out by the trial judge, some confusion arose due to the voir dire questions being framed in such a way that the venire persons were asked whether they could reach a certain result, rather than whether they would be able to follow the court's instructions. *See State v. Sloan, supra*, 756 S.W.2d at 507. Since there was no abuse of discretion, Anthony's second point is denied.

Anthony's third point on appeal is that the trial court erred in admitting the "hearsay" testimony of Ramo and Broderick. Anthony's point has two subpoints. First, Anthony argues that the trial court erred in allowing Ramo to testify that: (1) John Paul told him that Raymond met with Anthony and John Massud to discuss the leadership of the union after Raymond's death; and (2) the result of this meeting was that

Anthony was to have sole hiring and firing power, while John Massud would control office matters. Second, Anthony argues the trial court erred in admitting Broderick's testimony that John Paul and Prater approached him in 1977 about coming to work at Local 110 as Anthony's bodyguard.

■ It is well-established in Missouri that the statement of one conspirator is admissible against another under the co-conspirator exception to the hearsay rule, even when, as here, the defendants have not been charged with conspiracy. *State v. Pizzella*, 723 S.W.2d 384, 388 (Mo. banc 1987). Before the statement of a conspirator is admissible against his fellow conspirator, there must be a showing, by evidence independent of the statement, of the existence of a conspiracy. *Id.* The State is not required to present conclusive evidence that a conspiracy existed when it seeks to introduce into evidence the statement of the conspirator against another conspirator. *Id.* Rather, a conspiracy may be established through circumstantial evidence. *Id.* The appearance of "acting in concert" is sufficient circumstantial evidence of the existence of a conspiracy so as to allow for the application of the co-conspirator exception to the hearsay rule. *Id.* at 389. On appeal, our inquiry is limited to whether the trial judge has reasonable grounds to make his findings. *State v. Frederickson*, 739 S.W.2d 708, 711 (Mo. banc 1987).

■ We will address each of Anthony's subpoints separately. Anthony initially argues that the trial court erred in allowing Ramo to testify that John Paul told him that Raymond met with Anthony and John Massud to discuss the leadership of the union after Raymond Massud's death. We disagree. Before the prosecutor elicited this testimony, he explained to the trial judge at a bench conference that the State's theory was that Anthony, and others, were in a conspiracy to seize and maintain control of Local 110. The prosecutor stated:

Your Honor, I'm taking it somewhat chronologically but what ultimately is going to develop here between this witness and [Broderick] is that [Anthony] and

[John Paul] acting together were taking control of that union. That [John Paul] was going to put [Ramo] out there, that subsequently after this event of killing [victim] they were able to free up some other jobs and money out there. [Ramo] was part of the group considering—well, that was going to take control in there and be given jobs so [John Paul's] statements to him are in furtherance of that conspiracy to take over the union and/or the communications that are used to keep people in the group, so that's why they're in furtherance of the conspiracy to take it over.

He later continued:

... We would have to ask a couple of questions of [Ramo] to lay a foundation of his testimony—[Broderick] is going to testify that [John Paul and Prater] recruited him to go out as a body-guard for [Anthony] out there, that he was told that Anthony was going to be in charge of additional hirings and firings and was told by Anthony—hirings and firings of business agents and organizers out there. That was the plan.

Only after these exchanges did the trial judge allow testimony regarding a conversation that Ramo had with John Paul during which John Paul told him that Raymond met with Anthony and John Massud to discuss the leadership of Local 110. Since the prosecutor presented evidence of the existence of a conspiracy before the trial judge allowed Ramo to testify against Anthony, Ramo's testimony was admissible. Anthony's point is therefore denied.

■■■■ As was previously stated, Anthony's second subpoint is that the trial court erred in admitting Broderick's testimony that John Paul and Prater approached him in 1977 about coming to work at Local 110 as Anthony's bodyguard. Again, the statement of one conspirator is admissible against another co-conspirator once it has been established that a conspiracy existed. *State v. Pizzella, supra,* 723 S.W.2d at 388. Since the State provided ample evidence of the existence of a conspiracy to seize and maintain control of Local 110, the trial court had reasonable grounds to find this

testimony admissible. Anthony's third point is therefore denied.

Anthony's fourth point on appeal is that the trial court abused its discretion in denying Anthony a mistrial when the prosecutor asked Anthony if he and other unnamed co-defendants discussed kidnapping/harming Prater's family. Anthony contends that this exchange implicated him in uncharged crimes in the guise of credibility impeachment.

■■■■ Granting a mistrial is a drastic remedy. *State v. Shelton,* 779 S.W.2d 614, 616 (Mo.App.1989). It should only be utilized where there is grievous error which cannot otherwise be remedied. *Id.* The granting of a mistrial rests largely in the discretion of the trial court because the trial court is in a better position to determine any prejudicial effects from the alleged error. *Id.* In order to hold that the failure to grant a mistrial was reversible error, we must conclude, after reviewing the entire record, that as a matter of law the error was so prejudicial that its effect was not removed by the trial court's action.

At trial, Anthony admitted that after he found out that Prater was going to appear before the grand jury, he wanted to know what type of security Prater had for himself. Thereafter, the prosecutor asked: "[i]sn't it a fact that you were trying to decide whether or not to attempt to kill him down there?" Three times Anthony responded "no". The prosecutor then asked: "[a]nd didn't you and other members of your group talk about the possibility of kidnapping or harming his relatives in order to keep him from testifying?" At this point, defense counsel objected, requested a side bar and moved for a mistrial. The court subsequently denied Anthony's motion for a mistrial, but sustained the objection and instructed the jury to disregard the question.

■■■■ A defendant who elects to testify in his own behalf may be contradicted and impeached as any other witness. *State v. Freeman,* 667 S.W.2d 443, 448 (Mo.App. 1984). A defendant's waiver of the privilege against self-incrimination extends to

other prior misconduct if that prior misconduct is relevant to something other than credibility. *Id.* It is immaterial that one defendant has not been convicted of the prior misconduct if that misconduct is relevant for some purpose other than impeachment. *Id.* It has been held without exception that evidence to show that an accused has attempted to destroy evidence against him is always admissible as showing his consciousness of guilt. *Id.* at 449. Such evidence is admissible as evidence of the defendant's guilt of the principal facts charged and may be inquired into upon cross-examination of the defendant. *Id.*

■ Thus, evidence that Anthony or other members of his group talked about the possibility of kidnapping or harming Prater or his relatives in order to keep them from testifying was admissible to show Anthony's consciousness of guilt. The trial court, however, sustained Anthony's objection, and the prosecutor failed to refer further to this information. We are unable to conclude that Anthony was prejudiced by the exclusion of admissible evidence. Moreover, the court instructed the jury to disregard the prosecutor's question. Thus, Anthony not only did not suffer prejudice as a result of this question, he benefitted from it since the court instructed the jury to disregard admissible evidence. Since Anthony was not prejudiced by the prosecutor's question, his point is denied.

Anthony's fifth point is that the trial court erred in permitting the state to elicit testimony from both Ramo and Broderick that they and their families had been placed in witness protection programs. Anthony contends that this testimony was admitted under the guise of the credibility of these witnesses, when in fact, such testimony carried both the strong implication that: (1) the government credited their testimony; and (2) Anthony's character required such protection.

Initially, we note that Anthony asserted a motion in limine prior to trial to prevent any mention of the portion of Ramo's and Broderick's plea agreements concerning their placement and that of their families in witness protection programs. Anthony raised the same contentions as those argued above. The prosecutor argued that the jury should be informed of the complete plea agreements with these witnesses in order to properly evaluate their credibility. The trial judge decided that he would permit the question. The trial judge stated:

> I think it's an area I have discretion in and not so prejudicial that it's error for me to permit it in view of the fact that it is part of the total package that was given to him ... I don't believe [it's] so prejudicial to the defendant that it should be excluded....

Thereafter, during the trial, both Ramo and Broderick testified that as part of their plea agreement with the state and federal authorities they would testify in this and other proceedings. In exchange for their cooperation, they and their families would be placed in witness protection programs.

Our supreme court has held that it is proper for a prosecutor to elicit testimony during direct examination regarding any plea agreements or promises made with a state's witness in order to anticipate impeachment efforts by the defense, and to dispel any inference of concealment by the State of the agreements or promises. *State v. Borden,* 605 S.W.2d 88, 91 (Mo. banc 1980). The extent of the inquiry into the bias or interest is left largely to the discretion of the trial court. *Id.* Absent a clear abuse of discretion, we will not interfere with the trial court's ruling. *Id.*

■ We will address each of Anthony's contentions separately. As was previously stated, Anthony's first contention is that by allowing Ramo and Broderick to testify about their plea agreements including the fact that both they and their families had been placed in witness protection programs the state implied that the government credited their testimony. Asking a witness whether he is testifying by agreement is not likely to bolster his credibility. *See United States v. Le Fevour,* 798 F.2d 977, 983 (7th Cir.1986). If anything, it is likely to have the opposite effect by imputing a motive for the witness's testifying as the prosecution wants him to, regardless of the

truth. *Id.* Thus, Anthony's contention is without merit.

■ Anthony's second contention is the trial court erred in permitting Ramo and Broderick to testify about their plea agreements, including the fact that both they and their families had been placed in witness protection programs, because this implied that Anthony's character necessitated such protection. Though it is clear that it is proper for the prosecutor to elicit testimony during direct examination regarding any plea agreements or promises made with a State's witness, neither party cites any relevant Missouri law which addresses whether participation in a witness protection program is inherently exempt from the above principles of law. We conclude that it is not.

■ As a general proposition, a witness's participation in a witness protection program is a matter that must be handled delicately so that the jury does not consider evidence of such participation as proof of the defendant's alleged propensities. *See United States v. Vastola,* 899 F.2d 211, 235 (3rd Cir.1990); *United States v. Melia,* 691 F.2d 672, 675 (4th Cir.1982); *United States v. Ciampaglia,* 628 F.2d 632, 640 (1st Cir. 1980), *cert. denied* 449 U.S. 956, 1038, 101 S.Ct. 365, 618, 66 L.Ed.2d 221, 501. The prosecution may elicit the fact that a witness is involved in the witness protection program and has received substantial benefit so long as the prosecution does not exploit any inference of threat from the defendant. *See United States v. Vastola, supra,* 899 F.2d at 236. In assessing the prejudicial impact of the testimony, the trial court should consider whether it specifically inculpates the defendant as the source of threats to the witness. *Id.* at 236. However, the potential for prejudice is slight where the testimony only vaguely suggests that the witness was placed in the program because of threats from the defendant. *Id.* at 236.

■ Bearing these principles in mind, we are unconvinced that either Ramo or Broderick's testimony severely prejudiced Anthony. Neither Ramo nor Broderick stated or implied that they or their families were in the witness protection program due to threats from Anthony. Moreover, the prosecution did not exploit either Ramo's or Broderick's testimony. Accordingly, we conclude that the trial court did not abuse its discretion when it permitted the State to elicit Ramo's and Broderick's testimony regarding the witness protection program. Anthony's fifth point is denied.

Anthony's sixth point is that the trial court erred in denying Anthony's proposed alibi instruction and in submitting the State's instruction based on MAI–CR3d 308.04. Anthony's proposed instruction reads in pertinent part:

If the evidence in this case leaves in your mind a reasonable doubt that the defendant was present at St. Raymond's Church at or around 11:30 a.m. on September 17, 1980 and present at the intersection of Interstate I–55 and Reavis Barracks Road at or around 3:30 p.m. on September 17, 1989, then you must find the defendant not guilty.

The trial court refused this instruction, noting that it was confusing and misdirecting with regard to Anthony's presence at St. Raymond's Church at or around 11:30 a.m. In its place, the court submitted the following alibi instruction:

One of the issues in this case is whether the defendant was present at the intersection of Interstate I–55 and Reavis Barracks Road at or around 3:30 p.m. on September 17, 1980. On that issue you are instructed as follows:

1. The state has the burden of proving beyond a reasonable doubt that the defendant was present at the time and place the offense is alleged to have been committed.

2. If the evidence in this case leaves in your mind a reasonable doubt that the defendant was present at the intersection of Interstate I–55 and Reavis Barracks Road at or around 3:30 p.m. on September 17, 1980, then you must find the defendant not guilty.

Anthony contends that he was entitled to the reference to St. Raymond's Church because it was part of his alibi. Anthony

further contends that the omission of this language violated the applicable forms. Finally, Anthony contends that the submitted instruction and verdict director confused the jury. We will address each contention separately.

Again, Anthony's first contention is that he was entitled to the reference at St. Raymond's Church as it was part of his alibi. The purpose of an alibi instruction is to negate the presence of the defendant at or near the scene of the offense at the time of its commission. *The Missouri Bar Committee Comments on Missouri Approved Criminal Instructions*, "Alibi", at p. 1 (1974). Here, the crime of capital murder was committed when the explosives in victim's car were detonated. Thus, Anthony was entitled to an alibi instruction to cover his presence during the period of time when the murder was committed. Anthony was not entitled to an alibi instruction regarding preliminary stages of preparation, including planting the bomb at St. Raymond's Church. Moreover, where an MAI–CR3d instruction is called for, this instruction must be given to the exclusion of any other instruction. Rule 28.02(c). Since the trial court refused Anthony's proffered non-MAI instruction, but instead gave an approved MAI instruction, we are unable to conclude that it erred.

Anthony further contends that the omission of this language violated the applicable forms. Specifically, Anthony contends that the alibi instruction must follow the information in the verdict director. Anthony's contention is without merit. MAI–CR3d 308.04 states in pertinent part: "[o]ne of the issues (under Count ___) (in this case) is whether the defendant was present at [Briefly describe place where the evidence shows the offense was committed, and state date and time as submitted in the verdict directing instruction.])." While the date and time should be stated as submitted in the verdict director, the location of the offense need not mirror the verdict director.

Finally, Anthony contends that the submitted instruction and verdict director confused the jury. The verdict director explained that a person is responsible for his own conduct and the conduct of others if he acts with them with the common purpose of committing the offense. It further explained that to find Anthony guilty of capital murder, the jury needed to find that Anthony and others: (1) caused the death of victim by attaching a bomb to victim's car in St. Louis City causing it to detonate in St. Louis County; (2) intended to take victim's life; (3) knew they were practically certain to cause victim's death; (4) considered taking victim's life and reflected upon the matter cooly and fully before so doing; and (5) with the purpose of promoting or furthering the commission of capital murder, Anthony acted with others in committing the offense. We are unable to conclude that these instructions, in combination with the submitted instruction which specified that if Anthony was not present when the bomb exploded that the jury must find Anthony not guilty, by their nature are contradictory so as to confuse the jury. Anthony's sixth point is therefore denied.

Anthony's seventh point on appeal is that the trial court erred in failing to give Anthony's non-MAI proposed oral limiting instruction prior to Broderick's testimony to the effect that: (1) Broderick's prior guilty plea to the charge on trial could not be used as evidence of Anthony's guilt; however, (2) Broderick's guilty plea could be used for determining "how much, if at all, to rely on his testimony". Initially, we note that although Anthony failed to include this instruction in his appellate brief, he did file a motion for leave to amend his brief to include said instruction. We grant Anthony's request.

The submission or refusal to submit a tendered instruction is within the trial court's discretion. *Titsworth v. Powell*, 776 S.W.2d 416, 423 (Mo.App.1989). Here, we are unable to conclude that the trial court abused its discretion for two reasons. First, Anthony's proposed instruction was not a Missouri Approved Instruction. Second, and more importantly, it defies the well-established principle that an instruction should not unduly direct at-

tention to the credibility of a single witness. *State v. Everett,* 448 S.W.2d 873, 878 (Mo.1970). Anthony's proposed instruction only addressed Broderick's credibility. If the court had tendered this instruction, it would have implied that Broderick's testimony should not be believed. Moreover, this instruction may have confused the jury since they had not heard a similar instruction when Ramo testified even though Ramo stated he also entered a guilty plea. Anthony's seventh point is therefore denied.

Anthony's eighth point on appeal is that the motion court erred in denying Anthony's claims concerning the trial court's lack of jurisdiction under the Interstate Agreement on Detainers ("IAD"). Specifically, Anthony alleges the motion court erred when it found that the IAD cannot apply unless: (1) the State has filed a detainer; and (2) the defendant has entered into a rehabilitative program.

■ Appellate review of the dismissal of a 29.15 motion is limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. *Day v. State,* 770 S.W.2d 692, 695 (Mo. banc 1989). We will only deem such findings and conclusions clearly erroneous if, after reviewing the entire record, we are left with a definite and firm impression that a mistake has been made. *Id.* at 696.

■ Rule 29.15 provides: "[a]ny amended motion shall be verified by movant and shall be filed within thirty days of the date counsel is appointed or the entry of counsel that is not appointed. The court may extend the time for filing the amended motion for one additional period not to exceed thirty days." In *Day v. State,* 770 S.W.2d 692 (Mo. banc 1989), our supreme court held that under this rule, a movant has a maximum of sixty days from the date counsel is appointed to file an amended motion. *Id.* at 696. The court subsequently held that the request for an extension and the exercise by the trial court of its discretion to grant such extension must be made within thirty days counsel is appointed or counsel who is not appointed enters his appearance. *Clemmons v. State,* 785

S.W.2d 524, 527 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 229, 112 L.Ed.2d 183. If an amended motion is not timely filed, any new grounds raised therein are time barred and procedurally waived. *Sloan v. State,* 779 S.W.2d 580, 582 (Mo. banc 1989), *cert. denied* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236, *cert. denied* —— U.S. ——, 110 S.Ct. 1537, 108 L.Ed.2d 776.

■ Time periods begin with the appointment of the public defender's office, not when an individual attorney is designated by the public defender's office. *Ball v. State,* 775 S.W.2d 226, 227 (Mo.App.1989). Furthermore, transfer of a case from one public defender's office to another due to a conflict of interest does not affect the time limits for filing an amended motion. *Jackson v. State,* 772 S.W.2d 779, 781 (Mo.App. 1989).

■ Anthony's amended motion and his amendment to his amended motion fail for two reasons. First, Anthony's amended motion and his amendment to his amended motion were untimely. In an order dated September 8, 1988, the trial court appointed the Public Defender's Office of the City of St. Louis to represent Anthony in his post-conviction effort. On September 15, 1988, the Public Defender's Office made a *pro se* determination that it could not represent Anthony due to a conflict of interest. Therefore, it reassigned Anthony's case to the Special Public Defender's Office. In a letter dated September 22, 1988, the Special Public Defender's Office requested that the State Public Defender in Columbia, Missouri handle Anthony's post-conviction relief efforts due to a conflict of interest. On September 30, 1988, the Special Public Defender's office received a letter from the State Public Defender's Office, officially notifying the Special Public Defender that it was responsible for handling Anthony's case.

■ On November 14, 1988, the Special Public Defender's Office filed Anthony's first amended motion. It was not verified. The Special Public Defender subsequently filed an amended motion, four days later.

Strictly construing the above case law, Anthony's amended motion and his amendment to his amended motion were not timely, as they were received sixty-seven days and seventy-one days (respectively) after the appointment of the Public Defender's Office. Moreover, neither Anthony's amended motion nor his amendment to his amended motion is verified. It is well-settled that the requirement of verification is not a mere formality. Anthony's failure to verify his amended motion is a jurisdictional defect which precludes review of the claims therein. *Quinn v. State*, 776 S.W.2d 916, 918 (Mo.App.1989). Thus, since Anthony neither requested an extension of time within thirty days of the appointment of counsel nor verified either his amended motion or his amendment to his amended motion, case law dictates that we limit our review to the grounds in Anthony's *pro se* motion.

However, Anthony's post-conviction motion ensued shortly after Rule 29.15 was promulgated. As a result, the trial court interpreted Rule 29.15 without the benefit of the case law we have today. Therefore, the motion court thought it appropriate to and did consider Anthony's amended motion and his amendment to his amended motion. We, therefore, will gratuitously do the same.

■ As was previously stated, Anthony's eighth point is that the motion court erred when it found that the IAD cannot apply unless: (1) the State has filed a detainer; and (2) the defendant has entered into a rehabilitative program. We disagree. The IAD, referred to in Missouri as the "Agreement on Detainers", *see* Sections 217.450 to 217.520, RSMo (1986), only applies when "a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and [when] .... there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner...." Section 217.490, Article III, subd. 1, RSMo (1986). A review of the record indicates that Anthony was arrested and held in the St. Louis County Jail on April 14 and 15, 1983. On April 15, 1983, Anthony was moved to the Cape Girardeau City Jail, where he remained until July 23, 1983. On July 23, 1983, Anthony was moved to the St. Clair County Jail, where he remained until May 22, 1985. Pursuant to a *writ of habeas corpus ad prosequendum*, Anthony was turned over to state custody on May 22, 1985. We are unable to find anywhere in the record where it indicates that Anthony entered upon a term of imprisonment in a federal penal or correctional institution.

■ Moreover, we are unable to find any evidence that a detainer was filed on Anthony. Instead, as was previously stated, Anthony's presence at his state trial was secured by a *writ of habeas corpus ad prosequendum*. Where a federal prisoner's appearances in a state court are obtained via such a writ, the Agreement on Detainers is not applicable. *Winningham v. State*, 765 S.W.2d 724 (Mo.App.1989). Anthony's eighth point is therefore denied.

■ Anthony's ninth and final point on appeal is that the motion court erred in denying Anthony's post-conviction motion when the record indicates that his post-conviction counsel failed to read the entire trial transcript. It has been traditionally held that a post-conviction proceeding is directed to the validity of the conviction and cannot be used as a conduit to challenge the effectiveness of counsel in the post-conviction proceeding. *State v. Cayson*, 785 S.W.2d 794, 796 (Mo.App.1990). However, from this general rule, courts began to carve an exception. Courts realized that because an incarcerated prisoner's right to review of his conviction for constitutional infirmity inheres in our system of justice, appointed counsel must provide a certain level of representation. *Luster v. State*, 785 S.W.2d 103, 107 (Mo.App.1990). Courts concluded that if counsel *totally defaults* in performing his duties, the court should appoint new counsel. *Id.* (Emphasis ours). Thus, the exception evolved that if post-conviction counsel *abandons* movant, movant is entitled to the appointment of new counsel.

Our supreme court recently recognized this exception in *Luleff v. State*, 807 S.W.2d 495 (Mo. banc 1991). The court concluded that if a defendant claims abandonment of post-conviction counsel, the motion court shall make a *sua sponte* inquiry regarding the performances of both movant and counsel. *Id.* at 498. If counsel's apparent inattention results from movant's negligence or intentional failure to act, movant is entitled to no relief other than that which may be afforded upon the *pro se* motion. *Id.* If, however, the court determines that counsel has failed to act on behalf of the movant, the court shall apoint new counsel, allowing time to amend the *pro se* motion. *Id.* However, unless post-conviction counsel abandons the movant's cause, the general rule still applies, i.e. that a post-conviction proceeding cannot be used as a conduit to challenge the effectiveness of post-conviction counsel. *Sanders v. State*, 807 S.W.2d 493, 495 (Mo. banc 1991).

■ Here, Anthony's claim of ineffective assistance of post-conviction counsel cannot amount to a claim of abandonment of counsel, because Anthony's counsel filed both an amended motion and an amendment to his amended motion that were considered timely for the reasons stated above. Thus, Anthony cannot challenge his counsel's effectiveness. Anthony's ninth point is, therefore, denied.

For the reasons stated above, the conviction and denial of the Rule 29.15 motion for post-conviction relief are affirmed.

REINHARD, P.J., and CARL R. GAERTNER, J., concur.